*In re* CANALES COMPLAINT

Docket No. 224661. Submitted August 8, 2001, at Lansing. Decided September 21, 2001, at 9:00 A.M.

Dagoberto and Mary Canales filed a complaint with the Public Service Commission (PSC) alleging, in part, that LCI International Telecom Corporation, doing business as Qwest Communication Services, switched the Canaleses' long-distance telephone service without authorization in violation of the Michigan Telecommunications Act (MTA), MCL 484.2101 *et seq.* The staff of the PSC participated in the case and supported the complaint. A hearing officer determined that Mrs. Canales had standing to bring the complaint, despite the fact that Mr. Canales was the named customer, and that the case could proceed even though the Canaleses did not suffer any economic harm. The hearing officer recommended the minimum statutory fine and a cease and desist order and denied the PSC staff's request for fees that alleged that Qwest's defenses were frivolous. Qwest and the PSC staff filed exceptions to the hearing officer's proposal for decision. The PSC issued an opinion and order that agreed with the hearing officer's findings that Mrs. Canales had standing to bring the complaint and that Qwest had violated MCL 484.2505 and MCL 484.2502(a) and (b). The PSC did not impose a penalty for the violation of subsection 502(b) because the complaint did not mention a violation of that section. The PSC found that Qwest was not exempt from penalty under MCL 484.2506(3) and was responsible for a forged letter of authorization for the switching of the Canaleses' service submitted to Qwest by an independent distributor it employed. The PSC found the maximum allowable fine was appropriate for the violation of § 505 and imposed an additional fine for the two violations of subsection 502(a). The PSC ordered Qwest to pay the Canaleses their actual travel costs and also pay the PSC staff's attorney fees, finding Qwest's defenses frivolous. The PSC also entered a cease and desist order. Qwest appealed.

The Court of Appeals *held*:

1. The determination that Mrs. Canales had standing to file a complaint alleging violation of § 505 was lawful and reasonable and must be upheld.

2. Substantial evidence supports the finding of two violations of subsection 502(a).

3. The PSC did not err in adjudicating the violation of subsection 502(b) because Qwest was aware of the factual allegations underlying the violation and suffered no prejudice as a result of the lack of notice in the complaint.

4. The PSC's determination that the provisions of subsection 506(3) regarding penalty exemptions did not apply to this matter was lawful and reasonable.

5. The imposition of the maximum fine was reasonable in light of the circumstances. The findings of statutory violations and the fines imposed by the PSC must be affirmed.

6. The PSC erred in awarding costs and attorney fees on the basis of its finding that Qwest's defenses were frivolous. Qwest's arguments were neither devoid of arguable legal merit nor frivolous. The order imposing costs and attorney fees must be reversed.

Affirmed in part and reversed in part.

1. TELECOMMUNICATIONS — MICHIGAN TELECOMMUNICATIONS ACT — ACTIONS — STANDING.

Subsection 506(1) of the Michigan Telecommunications Act permits any person alleging a violation of § 505 of the act to initiate an action by filing a complaint with the Public Service Commission; subsection 506(1) does not restrict the term "person" to only end users, providers, or the Public Service Commission (MCL 484.2505, 484.2506[1]).

2. TELECOMMUNICATIONS — MICHIGAN TELECOMMUNICATIONS ACT — CONTESTED CASE HEARINGS — NOTICE.

A party to a contested case hearing regarding an alleged violation of the Michigan Telecommunications Act must be notified of the specific statutory sections involved in the hearing; procedural irregularities in providing such notice are not grounds for reversal of an administrative action absent a showing of material prejudice (MCL 24.271, 484.2203).

3. TELECOMMUNICATIONS — MICHIGAN TELECOMMUNICATIONS ACT — FINES — EXEMPTIONS.

The provision in subsection 506(3) of the Michigan Telecommunications Act that provides an exemption from the imposition of a fine for violation of § 505 of the act pertains to an unintentional and bona fide error, not to a deliberate fraudulent act such as forging a signature; the exemption covers the sort of truly inadvertent and unintentional errors that arise in the ordinary course of business, not acts of deliberate dishonesty (MCL 484.2505, 484.2506[3]).

*Fraser Trebilcock Davis & Foster, P.C.* (by *Graham K. Crabtree*), for LCI International Telecom Corporation.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, and *David A. Voges* and *Henry J. Boynton,* Assistant Attorneys General, for the Public Service Commission.

Before: K. F. KELLY, P.J., and WHITE and TALBOT, JJ.

PER CURIAM. LCI International Telecom Corporation, doing business as Qwest Communication Services, appeals as of right the Public Service Commission's (PSC) opinion and order finding that Qwest violated the Michigan Telecommunications Act (MTA), MCL 484.2101 *et seq.,* in connection with the switching of Dagoberto and Mary Canales' long-distance telephone service without authorization, and ordering that Qwest pay a fine of $21,000, pay the Canaleses $152.14 for their expenses, pay the costs and reasonable attorney fees incurred by the PSC staff and the Canaleses, and cease and desist from future violations of the MTA. We affirm in part and reverse in part.

I

Testimony presented at an evidentiary hearing before a hearing officer established that the Canaleses live in Millersburg, Michigan, where their local telephone service is provided by GTE. The Canaleses used MCI as their long-distance telephone service provider. Mrs. Canales testified that in late March 1999 she received a telephone call from someone who said her name was Yolanda and indicated that she was calling on behalf of MCI regarding less

expensive rates being offered by that company. Mrs. Canales agreed to accept the better terms from MCI. However, she subsequently received a notice in the mail that her long-distance service had been changed from MCI to Qwest, which, in fact, charged higher rates than MCI. When she called GTE and Qwest, Mrs. Canales learned that her long-distance service had been switched effective March 23, 1999, pursuant to a letter of authorization (LOA) purportedly signed by Mr. Canales. Mr. Canales testified that the signature on the LOA was forged and that he never authorized anyone to sign his name or switch his long distance service.

The Canaleses filed their complaint against Qwest with the PSC on June 29, 1999. This complaint, signed only by Mrs. Canales, alleged two counts: (1) that Qwest switched the Canaleses' long-distance service without authorization in violation of § 505 of the MTA, MCL 484.2505, and (2) that before this unauthorized switch, the Canaleses received false, misleading, or deceptive statements from a representative of Qwest in violation of subsection 502(a) of the MTA, MCL 484.2502(a). The PSC staff participated in the case and supported the complaint.

In July 1999, Qwest moved to dismiss the complaint on the ground that Mrs. Canales lacked standing. Qwest argued that because Mr. Canales was the customer of record for the telephone service, only he had standing to sign the complaint. The hearing officer denied Qwest's motion following a hearing.

The evidentiary hearing was held September 22, 1999. In addition to the Canaleses, Carol Kuhnow, Qwest's director of tariffs and compliance, testified. Kuhnow conceded that the signature on the LOA was

forged, but maintained that Qwest received the forged LOA from Voice Network, an independent representative hired to sell Qwest's long-distance service. Kuhnow presented Qwest's policies and procedures to prevent "slamming"[1] and a copy of its contract with Voice Network. The PSC staff did not present witnesses or evidence.

Qwest argued that despite the unauthorized switch in violation of § 505, it should not be fined because its conduct fell under subsection 506(3) of the MTA, MCL 484.2506(3), which states that fines should not be imposed where a violation was unintentional and a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error. Qwest argued that it had no way of knowing that the LOA was forged and that it was entitled to rely on the LOA. Qwest reasserted its argument before the hearing officer that Mrs. Canales lacked standing to bring the complaint because she was not named on the account as a customer. Qwest also argued that Mrs. Canales lacked standing because she suffered no economic loss due to the slamming incident.

The hearing officer rejected Qwest's arguments, pointing out that the MTA imposes strict liability for unauthorized switches, subject only to the exception provided under subsection 506(3). The hearing officer noted that subsection 505(1) did not require that a provider knowingly make an unauthorized switch, pointing out that a deliberate unauthorized switch was subject to more severe penalties under subsection 506(2)(a). The hearing officer found that forgery

---

[1] The unauthorized switching of long-distance services is commonly called "slamming."

of the LOA was not a bona fide error under subsection 506(3), but, rather, was an intentional act. The hearing officer determined that Mrs. Canales had standing to bring the complaint despite the fact that Mr. Canales was the named customer, and that slamming cases should proceed regardless of whether a complainant suffered economic loss, observing that § 506 of the MTA requires the assessment of penalties for such violations.

The hearing officer determined that because Qwest did not show a bona fide error under subsection 506(3), it was subject to the remedies and penalties provided under subsections 506(2). The hearing officer noted that the complainants did not suffer any economic harm and that this appeared to be the first slamming finding against Qwest. The hearing officer also noted that Qwest had procedures in place to minimize slamming. The hearing officer recommended the minimum $10,000 fine set by subsection 506(2)(a) and a cease and desist order. The hearing officer denied the PSC staff's request for fees under subsection 506(4), finding that Qwest's defenses were not frivolous.

Both Qwest and the PSC staff filed exceptions to the hearing officer's proposal for decision. Qwest challenged the hearing officer's findings regarding standing, the applicability of subsection 506(3), and the cease and desist order. The PSC staff challenged the hearing officer's failure to address the violation of § 502, the assessment of the minimum fine, and the finding that Qwest's defenses were not frivolous under subsection 506(4).

The PSC rejected Qwest's argument that Mrs. Canales lacked standing to bring the complaint under

subsection 506(1) of the MTA, finding authorization for the action in the statute. The PSC found that the hearing officer properly found a violation of § 505 and agreed with the PSC staff that Qwest also violated subsection 502(a) by making false, misleading, or deceptive statements regarding rates, terms, or conditions of providing service. The PSC reasoned:

> It is reasonable to conclude, as Mrs. Canales did, that the [false MCI] call was actually from someone connected with Qwest and was related to the subsequent slam. The claim that Qwest has no record of such a call is not surprising because the call was likely from Qwest's independent distributor. The claim that Qwest does not permit telephone solicitation does not mean that the independent distributor did not make the call because Qwest's policy against forged LOAs did not prevent the distributor from submitting one for the Canales [sic].

The PSC also found that Qwest violated subsection 502(b) by charging the Canaleses for toll service that they did not order, conduct that also constituted the violation of § 505. However, because the complaint did not mention subsection 502(b), the PSC did not impose a penalty for that violation.

The PSC rejected Qwest's claim that it was exempt from penalty under subsection 506(3). The PSC found that a forged signature on an LOA was not the equivalent of transposed digits on an LOA, but, rather, was a deliberate act that could not be considered an unintentional and bona fide error under subsection 506(3). The PSC also found that Qwest's procedures were not reasonably designed to avoid this sort of error. The PSC rejected Qwest's argument that it was not responsible for forgeries committed by its independent distributors because such acts were clearly

outside the independent entity's authority under the contract. The PSC ruled that the purpose of the service rendered by the agent, rather than the method of performance, was the proper test to determine whether acts were within the scope of the agency. The PSC concluded that the MTA did not permit Qwest "to hide behind the conduct of its employees or independent distributors."

In response to the PSC staff's exception to the amount of the fine, the PSC agreed that the maximum allowable fine of $20,000 "is appropriate to increase the incentive to eliminate slamming" and that lesser fines would be "insufficient incentives if providers conclude that they can simply reimburse the out-of-pocket costs for those who complain and keep the toll revenues from those who do not complain." The PSC rejected Qwest's argument that it had fewer complaints than its larger competitors. The PSC noted that Qwest was allowed to conduct burdensome discovery regarding the number of slamming complaints filed against other long-distance carriers but never provided anything more than vague assertions that its performance was any better than those carriers.

The PSC further found that in addition to a fine for the violation of § 505, Qwest should be fined $1,000 for the two violations of subsection 502(a)—the forged LOA and the fraudulent telephone call. The PSC also awarded the Canaleses their actual travel costs for appearing at the hearing. The PSC agreed with the PSC staff that it was entitled to attorney fees under subsection 506(4) because Qwest's defenses were frivolous. The PSC found Qwest's argument that Mrs. Canales lacked standing unsupported by the MTA, because it "rest[ed] . . . on the premise that an entire

phrase is to be read out of the statute." The PSC further noted that Qwest had been on notice since the September 23, 1998, opinion in PSC case no. U-11757 that the PSC did not agree with its interpretation of the statute.[2] The PSC also found that Qwest's assertion that reliance on a forged LOA was a bona fide error was unsupported by the MTA, "resting . . . on the premise that forgery is no more blameworthy than transposing digits." The PSC concluded that Qwest's defenses were devoid of arguable legal merit and therefore frivolous under § 209 of the MTA. The PSC also noted that "[t]aken as a whole, Qwest's strategy appears to have been to delay and increase the burden on other parties." The PSC upheld the cease and desist order. The PSC ordered Qwest to pay the PSC staff's attorney fees of $4,290.

II

The standard of review for PSC decisions is provided by MCL 462.26(8), which states:

> In all appeals under this section the burden of proof shall be upon the appellant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable.

To prove that the PSC's order was unlawful, the appellant must show " 'that the commission failed to follow some mandatory provision of the statute or was guilty of an abuse of discretion in the exercise of its judgment.' " *In re MCI Telecommunications Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999) (citation omitted). Our Supreme Court has explained that

---

[2] LCI/Qwest participated in PSC case no. U-11757.

"[t]he hurdle of unreasonableness is equally high. Within the confines of its jurisdiction, there is a broad range or 'zone' of reasonableness within which the PSC may operate." *Id.* The PSC's findings of fact made after an evidentiary hearing must be supported by competent, material, and substantial evidence on the whole record. *In re MCI Telecommunications Corp Complaint*, 240 Mich App 292, 303; 612 NW2d 826 (2000). A PSC decision is unreasonable when it is unsupported by the evidence.

Issues of statutory interpretation are reviewed de novo as issues of law. *In re MCI, supra*, 460 Mich 413. However, this Court accords substantial deference to the PSC's interpretation of its own orders and ordinarily will uphold those interpretations as long as they are supported by the record or are otherwise reasonable. *In re MCI, supra*, 240 Mich App 303. An agency's interpretation of new legislation is not afforded the same level of deference as that given to long-standing interpretations. *In re Michigan Cable Telecommunications Ass'n Complaint*, 239 Mich App 686, 690; 609 NW2d 854 (2000). However, "merely establishing that another interpretation of a statute is plausible does not satisfy a party's burden of proving by clear and convincing evidence that the PSC's interpretation is unlawful or unreasonable." *Id.*

III

The PSC's determination that Mrs. Canales had standing to file a complaint alleging violation of § 505 was neither unlawful nor unreasonable.

Subsection 506(1) of the MTA, MCL 484.2506(1), stated at the relevant time:

> Upon the receipt of a complaint filed by a person alleging a violation of section 505, an end user who has been switched to another provider in violation of section 505, or a provider who has been removed as an end user's provider without the end user's authorization, or upon the commission's own motion, the commission may conduct a contested case as provided under section 203.

Subsection 505(3)(a), MCL 484.2505(3)(a), defines an "end user" as "the retail subscriber of a telecommunications service." Qwest argues that subsection 506(1) limits the persons who can file a complaint to an end user, a provider who has been removed, or the PSC. Because the telephone service was in Mr. Canales' name, Qwest argues that Mrs. Canales was not an end user under subsection 505(3)(a) and so cannot file a complaint under subsection 506(1).

In contrast, the PSC reads the reference to "a person alleging a violation of section 505" in subsection 506(1) as unrestricted by the references to end users, providers, or the PSC that follow. In the instant case, the PSC relied on its earlier opinion in PSC case no. U-11757, issued September 23, 1998, where it explained:

> With regard to who can bring a claim based on allegations of slamming, the Legislature clearly intended to open the door as wide as possible. In addition to the customer who was slammed, the customer's authorized service provider, and the Commission itself, this provision authorizes the filing of a complaint by any "person" alleging a violation of Section 505. *Id.* Because the Act defines "person" as "an individual, corporation, partnership, association, governmental entity, or any other legal entity," the Commission finds that the procedures adopted by this order should allow anyone having knowledge of an unauthorized transfer of service to file a complaint against the alleged offender. MCL 484.2102(w); MSA 22.1469(102)(w).

In PSC case no. U-11757, the PSC went on to note that while the Legislature gave a wide variety of persons the ability to file slamming complaints, it also included penalties to deter parties from abusing the complaint process.

Granting the deference due the PSC's interpretation of subsection 506(1), we conclude that the PSC's determination that Mrs. Canales had standing should be upheld. Subsection 506(1) does not restrict the term "person" to only end users, providers, or the PSC. The statutory language is reasonably read to permit any "person alleging a violation of section 505" to initiate an action by filing a slamming complaint.

IV

Qwest next argues that the PSC erred in finding Qwest responsible for two violations of subsection 502(a) because there was no evidence that the telephone call from "Yolanda" was from an agent or employee of Qwest, or was otherwise related to the subsequent change of service. Quest argues that even if the call was from an employee of Qwest's independent distributor, Qwest cannot be held responsible for this call or the forged LOA because these acts were clearly outside the scope of the distributor's agency. Qwest also argues that the forged LOA, while falling under the scope of subsection 505(1), clearly falls outside the scope of subsection 502(a). The forged LOA was merely a representation, which Qwest believed true, that Mr. Carnales wanted to change his long-distance service to Qwest.

Subsection 502(a) of the MTA, MCL 484.2502(a), at the pertinent time stated in relevant part:

A provider of a telecommunication service shall not do any of the following:

> (a) Make a statement or representation, including the omission of material information, regarding the rates, terms, or conditions of providing a telecommunication service that is false, misleading, or deceptive.

A review of the record shows that the PSC's conclusion that Qwest had violated MTA subsection 502(a) with respect to the telephone call was based on substantial evidence before it or reasonable inferences therefrom.

Mrs. Canales' testimony concerning the telephone call in late March and the subsequent switch of the Canaleses' long-distance carrier pursuant to a forged LOA provided by Qwest's independent distributor supported a reasonable inference that the call was from someone connected to Qwest and was related to the subsequent slam. Competent, substantial, and material evidence before the PSC indicated that an agent working on behalf of Qwest called Mrs. Canales in March 1999 and made representations "regarding the rates, terms, or conditions of providing a telecommunication service" that were "false, misleading, or deceptive" and that related to the subsequent unauthorized switch of long-distance services. Thus, we affirm the finding of a violation with regard to the telephone call.

Nor did the PSC err in declining to permit Qwest to avoid liability on the basis of Quest's arguments that any wrongdoing was committed by its independent distributor, Voice Network, and was clearly outside the scope of Voice Network's agency. *See Kotmar, Ltd v Liquor Control Comm*, 207 Mich App 687, 691; 525

NW2d 921 (1994). Qwest hired Voice Network to obtain new customers for Qwest's long-distance service. The improper acts allegedly committed by Voice Network's employee were done in the course of signing up new customers for Qwest's long-distance service.

Next, we reject Qwest's argument that the PSC erred in finding that the presentation of the forged LOA itself constituted a separate violation of subsection 502(a). While we agree that the forged LOA itself was not "a statement or representation, . . . regarding the rates, terms, or conditions of providing a telecommunication service," the PSC's finding of a violation was based on Qwest's presentation of the forged LOA to the PSC staff as written authorization supporting the switch. In this context, Qwest made a representation that the conditions of its providing service to the Canaleses were pursuant to a valid written LOA. The PSC's finding of a violation is sufficiently supported.

V

Qwest next argues that the PSC erred in adjudicating a violation of subsection 502(b) that was never alleged in the complaint. Section 203 of the MTA, MCL 484.2203, requires that contested case hearings be conducted in accordance with the Administrative Procedures Act (APA), MCL 24.201 *et seq.* Section 71 of the APA, MCL 24.271, requires that a party be notified of the specific statutory sections involved in the hearing. Qwest did not receive notice of any violation of subsection 502(b) until after the close of the evidentiary hearing.

We conclude, nevertheless, that the PSC did not err in adjudicating the subsection 502(b) violation despite the lack of reference to that specific subsection in the original complaint. This Court has held that "procedural irregularities in fulfilling statutory notice requirements are not grounds for reversal of an administrative action absent a showing of material prejudice." *Livonia v Dep't of Social Services*, 123 Mich App 1, 18; 333 NW2d 151 (1983), aff'd 423 Mich 466; 378 NW2d 402 (1985). While the original complaint did not specifically refer to subsection 502(b), the record shows that Qwest was aware of the factual allegations underlying the subsection 502(b) violation, and, in any event, did not suffer any prejudice due to the lack of notice.

Subsection 502(b) of the MTA, MCL 484.2502(b), at the pertinent time stated in relevant part:

> A provider of a telecommunication service shall not do any of the following:
>
> \*       \*       \*
>
> (b) Charge an end-user for a subscribed service that the end-user did not make an initial affirmative order. Failure to refuse an offered or proposed subscribed service is not an affirmative order for the service.

The record provided shows that Qwest switched the Canaleses' long-distance service without their permission and sent them a bill for the service they did not order. A copy of the relevant bill was filed with the PSC shortly after the filing of the complaint and well before the evidentiary hearing. The complaint, forged LOA, and bill clearly show conduct that squarely fell under the language of subsection 502(b)

and provided Qwest with adequate notice that it could be held liable under that subsection.

Moreover, Qwest has not suffered any material prejudice as a result of the PSC's finding. The PSC did not fine or otherwise penalize Qwest for the violation of subsection 502(b). While subsection 601(a) of the MTA, MCL 484.2601, provides for the assessment of a fine for a first offense and allows a greater fine for any subsequent violations of the MTA, it does not set the fines increasingly higher for each additional subsequent violation. Here Qwest was found to have violated subsection 505(1) once and subsection 502(a) twice. Qwest's violation of subsection 502(b), as a fourth violation, did not require a higher fine than the fines imposed for the second and third violations.

VI

Qwest next asserts that it is entitled to the protection of subsection 506(3) because its reliance on the forged LOA was an inadvertent and bona fide error and that, in any event, the fine was excessive and unreasonable. Qwest argues that the examples listed under subsection 506(3) are not meant to be exclusive and should include situations where a provider relies on a document it had no reason to believe was forged. Qwest contends that the evidence showed that it implemented reasonable and proper procedures to prevent slamming and terminated the employment of the independent distributor that provided the forged LOA. It further argues that it has a good record, the slamming was unintentional, and the fine was therefore unreasonable. We disagree.

MCL 484.2506 at the pertinent time stated in relevant part:

> (2) If the commission finds that a person has violated section 505 or an order issued under section 505, the commission shall order remedies and penalties . . . including, but not limited to, 1 or more of the following:
>
> (a) Order the person to pay a fine for the first offense of not less than $10,000.00 or more than $20,000.00. . . .
>
> \*     \*     \*
>
> (3) Notwithstanding subsection (2), a fine shall not be imposed for a violation of section 505 if the provider has otherwise fully complied with section 505 and shows that the violation was an unintentional and bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error. Examples of a bona fide error include clerical, calculation, computer malfunction, programming, or printing errors. An error in legal judgment with respect to a person's obligations under section 505 is not a bona fide error. The burden of proving that a violation was an unintentional and bona fide error is on the provider.

The PSC's interpretation of subsection 506(3) as not applying under the instant circumstances is neither unlawful nor unreasonable. The statutory language specifies an unintentional error, not a deliberately fraudulent act such as forging a signature. The examples listed show that subsection 506(3) is meant to cover the sort of truly inadvertent and unintentional errors that arise in the ordinary course of business, not acts of deliberate dishonesty. Nor should Qwest's argument that it reasonably relied on a forged LOA provided by Voice Network bring its actions within the protection provided by subsection 506(3). As the PSC noted, while Qwest has directives to its independent solicitors that explicitly prohibit the conduct

engaged in here, it did not establish that it has internal procedures to assure that its directives have been complied with and the LOAs on which it acts are not forged or otherwise invalid.

The PSC's imposition of the maximum fine against Qwest was not unreasonable in light of the circumstances presented. The statute provides for a fine of $10,000 to $20,000 for a first offense. The PSC found that without heavy fines there would be insufficient incentive for long-distance providers to stop slamming because they would simply reimburse those customers who complain of the switch, but continue to collect fees from the other slammed customers. The PSC also determined that despite its burdensome discovery requests, Qwest offered no convincing support for its contention that its record on slamming was superior to other providers.

Thus, we affirm the fines set by the PSC.

### VII

Lastly, Qwest argues that the PSC erred in awarding costs and attorney fees on the basis of its finding that Qwest's defenses were frivolous. We agree.

Section 209 of the MTA, MCL 484.2209, states in relevant part:

> (1) If the commission finds that a party's position in a proceeding under this act was frivolous, the commission shall award to the prevailing party the costs, including reasonable attorney fees, against the nonprevailing party and their attorney.
>
> (2) As used in this section:
>
> (a) "Frivolous" means that at least 1 of the following conditions is met:

\*    \*    \*

(iii) The party's legal position was devoid of arguable legal merit.

The PSC determined that Qwest's argument that Mrs. Canales lacked standing under subsection 506(1) was frivolous because it required that the first part of that subsection referring to any "person alleging a violation of section 505" be ignored and because Qwest was on notice that the PSC did not agree with that interpretation of the statute because the PSC rejected that interpretation in a case decided one year before. The PSC also found that Qwest's argument that it was exempt from fines pursuant to subsection 506(3) required that a deliberate forgery be construed as an "unintentional and bona fide error" and, thus, the argument was devoid of arguable legal merit and frivolous under subsection 209(2)(a)(iii).

Although Qwest failed to prevail on these issues, its positions were not devoid of arguable legal merit. The standing issue presents a question of statutory interpretation of a relatively new enactment not yet interpreted by the courts. While the PSC determined that Qwest's position requires that the first clause of the statute be ignored, the argument that if the Legislature intended that same clause to be read so broadly as to include anyone, it was unnecessary to further enumerate specific entities who may file a complaint is a plausible legal argument and is not frivolous. Qwest was not obliged to accept the PSC's decision in the earlier case as a binding statement of the law and was within its rights to seek a judicial determination of the standing issue.

Similarly, the examples of "unintentional and bona fide" errors set forth in subsection 506(3) are clearly intended to be nonexclusive. Because it was not shown that Qwest knew that the LOA was forged and because Quest had instructed against the practice, the argument that subsection 506(3) applied was not devoid of arguable legal merit and was not frivolous.

We affirm the findings of statutory violations and the fines and reimbursements imposed for those violations. We reverse the imposition of costs and attorney fees as sanctions under subsection 506(4).