*In re* APPLICATION OF CONSUMERS ENERGY COMPANY

Docket Nos. 275135 and 275198. Submitted April 1, 2008, at Detroit. Decided April 10, 2008. Approved for publication May 27, 2008, at 9:00 a.m.

Consumers Energy Company filed an application in the Public Service Commission (PSC) seeking the authority to increase its rates for the distribution of natural gas and for other relief related to natural gas rates. In connection with the application, the PSC and Consumers agreed that Consumers would contribute two percent of its revenues to the Low-Income and Energy Efficiency Fund (LIEEF). The Association of Businesses Advocating Tariff Equity (ABATE) and the Attorney General, among others, intervened, arguing that the PSC lacked the authority to fund the LIEEF from natural gas utilities because LIEEF funding, by statute, could derive only from electric utilities that securitize costs. The hearing referee disagreed, ruling that the PSC could fund the LIEEF from gas utilities under its general ratemaking authority, and the PSC affirmed the ruling. ABATE and the Attorney General appealed this ruling, and the Attorney General separately appealed the PSC's approval of an equalization mechanism for post-employment benefits on the ground that it constituted improper retroactive ratemaking. The Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. The PSC's interpretation of its clear and unmistakable authority to administer the LIEEF as encompassing the power to secure funding was a reasonable interpretation of the administrative power conferred on it by the Legislature and is consistent with its ratemaking authority under MCL 460.6. Although MCL 460.10d(7) delineates excess securitization savings as a source of funding for the LIEEF, it would have been inconsistent for the Legislature to have mandated the creation of the LIEEF and supported its continuation while restricting its funding to only those securitization savings that exceed a specified level.

2. The purpose of the LIEEF is to provide shut-off and other protection to low-income customers and to promote energy efficiency by all customer classes, which clearly indicates that the

Legislature did not intend to restrict the LIEEF's benefits to electric ratepayers. Furthermore, continued funding of the LIEEF was recommended in part because of increasing natural gas prices. As a result, it would be inequitable to preclude Consumers from contributing to the LIEEF when both Consumers and its low-income ratepayers will benefit from it.

3. The Attorney General has not overcome the presumption that the PSC's approval of an equalization mechanism by which post-employment benefit expenses were deferred to a subsequent year was lawful and reasonable. This Court has held that deferred expenses are prospective, not retroactive, because they are considered an expense of the year to which they were deferred.

Affirmed.

PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — RATEMAKING AUTHORITY.

The Public Service Commission has the general authority to fund the Low-Income and Energy Efficiency Fund from both electric and natural gas utilities and is not limited to the excess securitization savings indicated in the statute that created the fund (MCL 460.10d[7]).

*H. Richard Chambers* for Consumers Energy Company.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *David A. Voges, Michael A. Nickerson*, and *Kristin M. Smith*, Assistant Attorneys General, for the Public Service Commission.

*Michael A. Cox*, Attorney General, and *Susan I. Leffler* and *Donald E. Erickson*, Assistant Attorneys General, for the Attorney General.

*Clark Hill, PLC* (by *Robert A. W. Strong* and *Leland R. Rosier*), for the Association of Businesses Advocating Tariff Equity.

Before: FORT HOOD, P.J., and TALBOT and SERVITTO, JJ.

PER CURIAM. In Docket No. 275135, the Attorney General appeals as of right an opinion and order issued

by the Public Service Commission (PSC). The Attorney General asserts that the PSC was not authorized to approve a natural gas rate increase of $80,804,000 a year for Consumers Energy Company (CECo) where the rate enabled CECo to recover $17,427,000 from natural gas ratepayers for contributions to the Low-Income Energy Efficiency Fund (LIEEF). Further, the Attorney General asserts that the order impermissibly enabled implementation of an equalization mechanism for pension benefits and "other post employment benefits." In Docket No. 275198, the Association of Businesses Advocating Tariff Equity (ABATE) appeals as of right, also challenging CECo's right to recover $17,427,000 from natural gas ratepayers for contributions to the LIEEF. The appeals were consolidated for this Court's review.[1] We affirm.

## I. BACKGROUND AND FACTUAL HISTORY

A short history regarding interpretation and administration of the LIEEF is useful to understand both the objections raised by the Attorney General and ABATE and the factors that guide our review of the PSC's decision.

On June 3, 2000, the Customer Choice and Electricity Reliability Act (CCERA), MCL 460.10 *et seq.*, was enacted into law. 2000 PA 141.[2] A stated purpose of the act was to "ensure that all persons in this state are afforded safe, reliable electric power at a reasonable rate." MCL 460.10(2)(d). Part of the methodology implemented to achieve this goal included the imposi-

---

[1] *Attorney General v Pub Service Comm,* unpublished order of the Court of Appeals, entered February 8, 2007 (Docket Nos. 275135 and 275198).

[2] Concurrently, the Legislature enacted the securitization act, MCL 460.10h through 460.10cc, which allowed electric utilities to refinance or retire debt through the use of lower cost secured bonds. 2000 PA 142. See specifically MCL 460.10i.

tion of a rate freeze for the larger electrical utilities with one million or more retail customers until December 31, 2003. MCL 460.10d(1). In addition, the CCERA created the LIEEF, which was intended "to provide shut-off and other protection for low-income customers and to promote energy efficiency by all customer classes." MCL 460.10d(7). Section 10d(7) specifically provided that the LIEEF would receive as a source of its funding monies derived from securitization savings:

> *If* securitization savings exceed the amount needed to achieve a 5% rate reduction for all customers, then, for a period of 6 years, 100% of the excess savings, up to 2% of the electric utility's commercial and industrial revenues, shall be allocated to the low-income and energy efficiency fund administered by the commission. [MCL 460.10d(7) (emphasis added).]

Consistently with this statutory directive, on November 20, 2001, the PSC issued an opinion and order discussing hearings conducted regarding the development of policies and procedures for administration of the LIEEF. The PSC recognized MCL 460.10d(6) as requiring "a portion of the cost savings from the issuance of securitization bonds to be used as a source of funding" for the LIEEF in addition to "Public Act 119 of 2001," an appropriations bill, which provided "the current fiscal year's appropriation for the Fund." *In re Administration and Operation of the Low-Income and Energy Efficiency Fund,* opinion and order of the PSC, issued November 20, 2001 (Case No. U-13129), p 1. At this time, the PSC indicated that annual disbursements from the LIEEF would encompass "three broad categories: (1) energy assistance for low-income customers, (2) conservation and energy efficiency measures targeted toward reducing the usage and bills of low-income customers, and (3) the development of energy efficiency

programs that benefit all customer classes." *Id.* at 4. The PSC went further and indicated an intention "to create an endowment-type fund to finance programs that assist low-income customers and energy efficiency projects with a time horizon extending beyond the six-year period in Section 10d(6)." *Id.* Notably, the PSC explained that it interpreted the statutory provision "to provide the basis for funding programs that affect all types of energy assistance and efficiency, not merely electricity, and to cover programs that extend throughout the entire state, not merely Detroit Edison's service territory" and asserted that "[t]he wording of Section 10d(6) does not support a more restrictive interpretation." *Id.* at 5-6.

ABATE objected and sought a rehearing. The PSC rejected the petition, reasoning that its status as a "quasi-legislative/quasi-judicial decision-making body" permitted it to "implement policy through a case-by-case approach as well as through the rulemaking process set forth in the [Administrative Procedures Act, MCL 24.201 *et seq.*]." *In re Administration and Operation of the Low-Income and Energy Efficiency Fund,* order of the PSC, issued October 23, 2003 (Case No. U-13129), p 2. The PSC opined that its November 20, 2001, order "was a proper exercise of its ratemaking and policymaking authority" and that "[s]ection 10(d) does not require the [PSC] to adopt rules or standards." *Id.* at 3. Citing the broad discretion bestowed on the PSC by the Legislature "to select the beneficiaries of the Fund," the PSC minimized the legitimacy of ABATE's expressed concerns regarding administration of the LIEEF, noting:

> Given that the [PSC] must periodically report on the [LIEEF] to the Legislature and that the Legislature annually appropriates the funding for the program, any concern

that the implementation of the [LIEEF] by the [PSC] could be inconsistent with the intent of the Legislature rings hollow. [*Id.* at 3.]

The PSC has submitted periodic reports to the Governor and the Legislature as mandated by MCL 460.10d(7). In its initial report, the PSC advised that Detroit Edison was the sole contributor to the LIEEF because it was the only electric utility able to meet the criteria established for contribution through securitization savings. Further, the PSC reasserted its intent to create a program like the LIEEF indefinitely for both electric and gas consumers, consistently with its opinion and orders in Case No. U-13129. It also noted that actual funds had fallen short of estimated amounts that were used to set the appropriations. This information was reiterated in subsequent reports to the Governor and the Legislature.

In 2004, the PSC reported that the lifting of the rate freeze on December 31, 2003, MCL 460.10d(1), effectively eliminated securitization savings as a source of funding for the LIEEF. Commensurate with its grant of interim rate relief to Detroit Edison, the PSC "rolled the LIEEF funding requirement into base rates for Edison's electric customers and continued funding the LIEEF as part of the utility's cost of service." *In re Administration and Operation of the Low-Income and Energy Efficiency Fund,* opinion and order of the PSC, issued August 21, 2007 (Case No. U-13129), p 1.

Notably, the Legislature has maintained yearly appropriations for the LIEEF program. Through 2004 PA 354, § 105, the Legislature appropriated $45 million for the LIEEF, which required the PSC to provide reports on the distribution of these funds. 2004 PA 354, § 335. In 2005 PA 156, § 117, the Legislature made a $60 million appropriation for the LIEEF and again required a report on distribution of the funds. The PSC

subsequently approved similar electric rate orders for CECo.[3]

On July 1, 2005, CECo filed an application in the PSC addressing, among other issues, rates for the distribution of natural gas but *not* rates relative to electricity. CECo proposed that it contribute $15 million to the LIEEF. When the PSC staff proposed increasing the contribution to $17.25 million, CECo agreed. The PSC rejected the Attorney General's and ABATE's arguments that LIEEF funding could only derive from *electric* users, and not from natural gas ratepayers as part of operations and maintenance expenses. Quoting its opinion and order in Case No. U-14346, the PSC held:

> The [PSC] agrees with the [hearing referee] and the Staff that under its general ratemaking authority, the [PSC] may authorize the funding of LIEEF through mechanisms in addition to that described in MCL 460.10d(7). As the [PSC] found in Case No. U-14347, pp 44-45:
>
> "The Legislature's intent in enacting MCL 460.10d was to have the [PSC] undertake a broad approach to funding and administering low-income and energy efficiency programs. For example, MCL 460.10s requires the [PSC] to monitor the extent to which federal funds are available for low-income and energy assistance programs and, if there is a reduction in federal funds, to hold a hearing to determine the amount of funds available and the need for supplemental funding. Section 10s thus expresses the Legislature's intent that the [PSC] take the necessary steps to assure that low income and energy efficiency funds are available."
>
> The [PSC] observes that LIEEF funds are an essential means to reduce bad debt and uncollectible expenses, which are expenses borne by all ratepayers of both gas and electric utilities. Moreover:

---

[3] "The Consumers Energy Company's orders issued on December 22, 2005 in Case No. U-14347 and November 21, 2006 in Case No. U-14547, have also made provisions for funding the LIEEF." *In re Low-Income and Energy Efficiency Fund,* order of PSC, issued October 23, 2003 (Case No. U-13129), p 2.

"The [PSC] notes that [the] circumstances . . . where the utility voluntarily offered to include contributions to the LIEEF as part of its operations expenses, are analogous to those in *The Detroit Edison Co v Public Service Comm,* 127 Mich App 499; 342 NW2d 273 (1983), where the Court of Appeals held that it was within the [PSC]'s discretion to allow or disallow operating expense items for charitable contributions. Id. at 524 . . . . Thus, if [CECo chose to contribute directly to certain nonprofits engaged in providing energy assistance to low and fixed-income customers, it would clearly be within the [PSC]'s discretion to permit such expenditures as part of the utility's operating costs." [December 22, 2005, order in Case No. u-14347, p 45.]

Finally, the positions taken by the Attorney General and ABATE regarding the [PSC]'s alleged lack of statutory authority to fund and administer the LIEEF, directly conflict with the fact that the Legislature appropriated $60,000,000 to fund LIEEF for the fiscal year ended September 30, 2006 in Section 117 of 2005 PA 156. Likewise, in Section 117 of 2006 PA 345, the Legislature appropriated an additional $60,000,000 for LIEEF grants for the fiscal year ended September 30, 2007. By appropriating the funds for the LIEEF program, the Legislature has expressed its intent that the program continue at that funding level. As our Supreme Court held in *Regents of the University of Michigan v Michigan,* 395 Mich 52, 66; 235 NW2d 1 (1975), "The Legislature has the right to state its advice or wishes through an expression of intent" in an appropriations bill. The [PSC] therefore adopts $17,427,000 in expense for [CECo's] contribution to the LIEEF. [*In re Application of Consumers Energy Co,* opinion and order of the PSC, issued November 21, 2006 (Case No. U-14547), pp 51-52.]

## II. ISSUES ON APPEAL

The arguments made by the Attorney General and ABATE in this appeal are: (1) contributions to the LIEEF cannot benefit natural gas ratepayers and rates collected from natural gas ratepayers therefore cannot

be used for the fund; (2) funding for the LIEEF was statutorily authorized for only six years and was limited to excess securitization savings of electric utilities that securitized costs, precluding other sources of funding; and (3) because there is no clear and unmistakable statutory authority permitting the PSC to force natural gas ratepayers to contribute through natural gas rates to a program created by a statute relating to electric utilities, it was error to order contribution by CECo and then allow CECo to recover the contribution plus taxes through operation and maintenance expenses that were built into rates. In addition, the Attorney General challenges the PSC's approval of an equalization mechanism for pension and other post-employment benefits as comprising improper retroactive ratemaking.

### III. STANDARD OF REVIEW

The standard of review for PSC orders is narrow and well-defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Michigan Consolidated Gas Co v Pub Service Comm,* 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and satisfactory evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint,* 460 Mich 396, 427; 596 NW2d 164 (1999). And, of course, an order is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Pub Service Comm,* 377 Mich 259, 279; 140 NW2d 515 (1966). In sum, a final order of the PSC must be authorized by law and supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Attorney General v Pub*

*Service Comm,* 165 Mich App 230, 235; 418 NW2d 660 (1987).

Consistently with the law regarding appellate review of an administrative agency's decisions, we give due deference to the PSC's administrative expertise and will not substitute our judgment for that of the PSC. *Attorney General v Public Service Comm No 2,* 237 Mich App 82, 88; 602 NW2d 225 (1999). Importantly, we "give great weight to any reasonable construction of a regulatory scheme that the PSC is empowered to administer," *Champion's Auto Ferry, Inc v Pub Service Comm,* 231 Mich App 699, 708; 588 NW2d 153 (1998), but we may not abandon our responsibility to interpret statutory language and legislative intent. *Miller Bros v Pub Service Comm,* 180 Mich App 227, 232; 446 NW2d 640 (1989). Whether the PSC exceeded the scope of its authority is a question of law that we review de novo. *In re Complaint of Pelland Against Ameritech Michigan,* 254 Mich App 675, 682; 658 NW2d 849 (2003). [*In re Application of Detroit Edison Co,* 276 Mich App 216, 224-225; 740 NW2d 685 (2007).]

IV. ANALYSIS

We first address the arguments pertaining to whether funding of the LIEEF through operation and maintenance expenses is authorized by statute, including the more specific assertion that contributions to the LIEEF cannot benefit natural gas ratepayers and, therefore, that rates collected from them cannot be used for the fund. The PSC asserts that its authority for both of these challenged decisions is derived from its general ratemaking authority. MCL 460.6.[4] In order to determine the propriety of permitting CECo's contribution to the LIEEF, we must first deal with the assertion that

---

[4] MCL 460.6(1) states, in relevant part: "The public service commission is vested with complete power and jurisdiction to regulate all public utilities in the state . . . . The public service commission is vested with the power and jurisdiction to regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of public utilities."

funding for the LIEEF is exclusively confined to the availability of securitization savings as delineated in MCL 460.10d(7).

The PSC has no common-law powers and, therefore, the sole source of its power is statutory. *Union Carbide Corp v Pub Service Comm*, 431 Mich 135, 146; 428 NW2d 322 (1988); *In re Detroit Edison Application, supra* at 225. The statutes that confer authority on the PSC must be strictly construed, and a power may only be exercised if it is conferred by clear and unmistakable language. *Union Carbide Corp, supra*; *In re Detroit Edison Application, supra*.

The LIEEF was created by MCL 460.10d(7), which provides:

> If securitization savings exceed the amount needed to achieve a 5% rate reduction for all customers, then, for a period of 6 years, 100% of the excess savings, up to 2% of the electric utility's commercial and industrial revenues, shall be allocated to the low-income and energy efficiency fund administered by the commission. The commission shall establish standards for the use of the fund to provide shut-off and other protection for low-income customers and to promote energy efficiency by all customer classes. The commission shall issue a report to the legislature and the governor every 2 years regarding the effectiveness of the fund.

This Court has previously acknowledged that MCL 460.10d created the LIEEF and conferred authority on the PSC to administer the fund. *In re Detroit Edison Application, supra* at 229. We defer to an agency's interpretation of a statute outlining its powers, *In re Canales Complaint*, 247 Mich App 487, 496; 637 NW2d 236 (2001), as long as the interpretation is supported by the record and is reasonable. *In re Application of Indiana Michigan Power Co*, 275 Mich App 369, 373-374; 738 NW2d 289 (2007). We conclude that the PSC's interpretation of its clear and unmistakable authority to administer the LIEEF, as encompassing the power to

secure funding, was a reasonable interpretation of the administrative power conferred on it by the Legislature and is consistent with its ratemaking authority pursuant to MCL 460.6.

The primary goal of statutory interpretation is to ascertain and give effect to legislative intent. *Casco Twp v Secretary of State*, 472 Mich 566, 571; 701 NW2d 102 (2005). We enforce clear and unambiguous statutory language as written. *Ayar v Foodland Distributors*, 472 Mich 713, 716; 698 NW2d 875 (2005). MCL 460.10d(7) delineates a source for funding the LIEEF, but does not *restrict* funding of the LIEEF to excess securitization savings. We find it inconsistent for the Legislature to have mandated the creation of the LIEEF and yet, using appellants' logic, to have restricted the funding source to securitization savings "if" they exceeded a specified level. MCL 460.10d(7). The LIEEF obviously could not be administered if there were no monies in it, and the PSC therefore had to take measures to secure funding in order to fulfill its statutorily imposed duty to administer the LIEEF.

In addition, the Legislature has indicated its intent for the continuation of the LIEEF through the provision of ongoing appropriations beyond the initial six-year period. Thus, the absence of specific statutory language regarding the authority to secure funds for the LIEEF through operation and maintenance expenses does not serve to preclude the PSC from funding the LIEEF by these means. Moreover, we have found no construction of the "clear and unmistakable" requirement that would necessitate a separate legislative endorsement for each action taken in the course of administering the fund. The Legislature conferred broad authority on the PSC to administer the LIEEF. The Legislature is not required to micromanage the PSC by statutorily delineating every aspect of its administrative power given the initial grant of authority

to manage and oversee this fund.

Having determined that the PSC had the authority to develop a structure and mechanism for funding of the LIEEF, we next address the contention of appellants that funding and distribution was restricted only to electric utilities and their customers. Our previous ruling addressing Detroit Edison's contention that a 2004 PSC order was unlawful and unreasonable because "it requires Edison's customers to provide monies for the LIEEF that will not be used in Edison's service territory which serves no rational purpose" is both instructive and applicable to the circumstances of this appeal. *In re Detroit Edison Application, supra* at 230. We previously rejected Detroit Edison's argument regarding territorial limitations for use of LIEEF funds, noting that the CCERA had created only one fund for low-income and energy-efficiency programs, which we interpreted as confirming the PSC's determination that the distribution of LIEEF funds was not restricted or defined by territorial contributions. The Court stated that "no statutory language limits the use of a utility's funds to that utility's service territory." *Id.* at 230. Further, we noted that Detroit Edison and CECo were the only utilities with enough customers to qualify to contribute securitization savings to the LIEEF and concluded that this supported the PSC's determination that LIEEF funds could be used throughout the state, without regard for the location of those contributing to the fund. *Id.*

First and foremost, this Court will generally defer to an agency's interpretation of a statute it is charged with interpreting where it is supported by the record and is reasonable. *In re Application of Indiana Michigan Power Co, supra* at 373-374. The CCERA does not provide that only electric customers will benefit from the LIEEF. While initial funding for the program was designed to originate from electric utilities' securitiza-

tion savings, MCL 460.10d(7) provides that the fund has a broader reach and purpose, designating that it is intended to be used "to provide shut off and other protection to low-income customers and to promote energy efficiency by all customer classes." Clearly, this statutory language does not restrict the intended beneficiaries of the LIEEF solely to electric ratepayers. Testimony at the hearing indicated that continued funding of the LIEEF was being recommended in part because of increasing natural gas prices, and that the fund was intended to benefit "Michigan's low income citizens," not just electric utility customers. As a result, it would be inequitable to preclude CECo from contributing to this fund because both the utility and its low-income customers will reap a benefit.

We note that appellants cite *Attorney General v Pub Service Comm,* 269 Mich App 473; 713 NW2d 290 (2006), which is distinguishable from the issue presented here. Although the Court held that the PSC could not charge customers for a renewable energy program from which they did not directly benefit, the ruling focused on the fact that the PSC was authorizing a charge to consumers for a program that was not statutorily mandated. In contrast, the LIEEF was created by statute. Moreover, this Court held that the Legislature intended that participation in green power programs to be voluntary. *Id.* at 482. In contrast, there exists no evidence of a legislative intent that funding of the LIEEF was to be so restricted or compartmentalized.

The final issue concerns Docket No. 275135 only. The Attorney General asserts that the PSC had no clear and unmistakable statutory or other authority to approve an equalization mechanism it described as follows:

> The trackers would allow the annual difference between the pension expenses included in rates, and the actual

annual pension expense recorded by Consumers, to be deferred. Consumers claimed that if the annual pension expense is greater than the expense authorized in rates, the difference would be recognized as a regulatory asset for future recovery. Similarly, if the annual pension expense is less than that approved in rates, Consumers would recognize a regulatory liability for distribution to customers.

The Attorney General asserts that approval of this equalization mechanism constituted prohibited retroactive ratemaking. The PSC concluded that pursuant to its general ratemaking powers it was authorized to adopt a ratemaking formula that included this equalization mechanism, which was designed to ensure, to the extent possible, that rates would match expenses. We note that the rate is presumed, prima facie, to be lawful and reasonable. *In re Detroit Edison Application, supra* at 224. The Attorney General has failed to overcome this presumption. In *Attorney General v Pub Service Comm,* 262 Mich App 649, 656; 686 NW2d 804 (2004), this Court held that deferred expenses were an expense of the year to which they were deferred, and were therefore prospective. Specifically, this Court noted that " 'when capitalized expenditures are amortized, the amortization becomes a current expense even though it reflects expenditures that were capitalized in the past.' " *Id.,* quoting *Ass'n of Businesses Advocating Tariff Equity v Pub Service Comm,* 208 Mich 248, 261; 527 NW2d 533 (1994). There is no sound basis for distinguishing the equalization mechanism approved by the PSC in this case from deferred expenses affirmed in prior caselaw. Accordingly, the deferral of pension and other post-employment benefit expenses to a subsequent year did not constitute retroactive ratemaking.

Affirmed.