*In re* APPLICATION OF DETROIT EDISON COMPANY TO
INCREASE RATES

Docket No. 302110. Submitted April 11, 2012, at Lansing. Decided July
26, 2012, at 9:00 a.m. Leave to appeal granted, 493 Mich 950.

Detroit Edison Company filed an application with the Public Service
Commission (PSC) seeking to increase electrical rates. When the
PSC failed to act on the application within 180 days, Detroit
Edison elected to self-implement a rate increase. The PSC subse-
quently issued an order approving a smaller rate increase than
that self-implemented by Detroit Edison. Detroit Edison agreed to
refund the excess funds that had been collected by allocating the
total refund amount among customer classes on the basis of each
class's pro rata share of the total revenue collected. The Associa-
tion of Businesses Advocating Tariff Equity (ABATE), an inter-
vening party, objected to the proposed refund methodology, assert-
ing that MCL 460.6a(1) required Detroit Edison to calculate a
refund for primary customers, i.e., approximately 3,000 large
purchasers of electricity, on the basis of each primary customer's
actual overpayment. The PSC rejected ABATE's argument and
approved a refund based on rate schedule class. ABATE appealed.

The Court of Appeals *held*:

MCL 460.6a(1) states that a utility must refund to customers,
with interest, any portion of total revenues collected under a
self-implemented plan that exceed the total that would have been
produced by the rates or charges subsequently ordered by the PSC
in its final order. The PSC must allocate that refund among
primary customers based on their pro rata share of the total
revenue collected through the applicable increase. Section 6a(1) is
ambiguous. The language of § 6a(1) could be viewed as requiring a
return of monies previously paid. However, the term "refund" has
previously been given a broader meaning within the context of
PSC statutes. And the language requiring a refund to primary
customers based on their pro rata share of the revenues collected
can be read as requiring that individual primary customers be
refunded the amounts they actually overpaid, or it can be read as
requiring that all of the primary customers together be given a
refund based on all of the primary customers' pro rata share of the

total revenue collected. Cogent reasons—including the avoidance of the imposition of burdensome administrative costs—supported the PSC's interpretation. The PSC's action was lawful and reasonable.

Affirmed.

SAAD, J., dissenting, asserted that the PSC's ruling defeated the public policy purposes and plain language of two statutes. The Customer Choice and Electricity Reliability Act (Choice Act), MCL 460.10 *et seq.*, states that its purposes include ensuring that Michigan customers have a choice of electric suppliers and to foster competition. MCL 460.6a(1) requires that primary customers be reimbursed for the actual amount that they were overcharged by Detroit Edison under its self-implemented plan as opposed to the amounts resulting from the refund plan approved by the PSC. Further, by spreading the total refunds to all Detroit Edison customers in the future by reducing their rates according to a formula that takes the total overcharges and spreads it among Detroit Edison customers, those primary customers who overpaid and then switched electric suppliers will receive no refund, disincentivizing the choice and competition promoted by the Choice Act.

PUBLIC UTILITIES — SELF-IMPLEMENTED RATE INCREASES — REFUNDS — PRIMARY CUSTOMERS — PRO RATA SHARE.

MCL 460.6a(1) states that a utility must refund to customers, with interest, any portion of total revenues collected under a self-implemented plan that exceed the total that would have been produced by the rates or charges subsequently ordered by the Public Service Commission (PSC) in its final order; the PSC must allocate that refund among primary customers based on their pro rata share of the total revenue collected through the applicable increase; the language requiring a refund to primary customers based on their pro rata share of the revenues collected can be read as requiring that all of the primary customers together be given a refund based on all of the primary customers' pro rata share of the total revenue collected.

*Clark Hill PLC* (by *Robert A. W. Strong*) for the Association of Businesses Advocating Tariff Equity.

*Bruce R. Maters, Jon P. Christinidis*, and *Fahey Schultz Burzych Rhodes PLC* (by *William K. Fahey* and *Stephen J. Rhodes*) for the Detroit Edison Company.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Counsel, and *Steven D. Hughey* and *Kristin M. Smith*, Assistant Attorneys General, for the Public Service Commission.

Before: HOEKSTRA, P.J., and SAWYER and SAAD, JJ.

SAWYER, J. The Association of Businesses Advocating Tariff Equity (ABATE) appeals of right an order of the Michigan Public Service Commission (PSC) providing that Detroit Edison Company was to refund revenue it had collected through self-implemented rates; the rates were self-implemented while Detroit Edison was awaiting a final order on an application for a rate increase. Rather than requiring a refund to each customer based on that customer's overpayment, the PSC held that the refund was to be made prospectively in the January 2011 billing month to classes of customers based on the classes' pro rata share of the self-implemented increase. We affirm.

I. FACTS AND PROCEEDINGS

On January 26, 2009, Detroit Edison applied for an increase in electrical rates in the amount of $378,000,000. Under § 6a(1) of 2008 PA 286 (Act 286), MCL 460.6a(1), the PSC was required to act on this application by January 26, 2010. However, § 6a(1) also provided that Detroit Edison was entitled to self-implement an interim rate unless the PSC acted on its application within 180 days or issued an order preventing or delaying self-implementation for good cause. No such action was taken and no such order issued. Detroit Edison elected to self-implement $280 million of rate relief.

On January 11, 2010, the commission issued a final order approving a rate increase of only $217,392,000. Section 6a(1) required a refund because the new rate was less than the self-implemented rate. The refund amount, with interest, was determined to be $26,872,231.

With respect to the refund, Detroit Edison proposed to allocate the total refund amount among customer classes based upon each customer class's pro rata share of the total revenue collected. ABATE objected to this proposed refund methodology as it pertained to primary customers. It maintained that § 6a(1) required that Detroit Edison calculate a refund for each primary customer based upon each primary customer's actual overpayment and that it refund an amount equal to the actual overpayment to each primary customer. Regarding the refund, § 6a(1) states in pertinent part:

> If a utility implements increased rates or charges under this subsection before the commission issues a final order, that utility shall refund to customers, with interest, any portion of the total revenues collected . . . that exceed the total that would have been produced by the rates or charges subsequently ordered by the commission in its final order. *The commission shall allocate any refund required by this section among primary customers based upon their pro rata share of the total revenue collected through the applicable increase,* and among secondary and residential customers in a manner to be determined by the commission. [Emphasis added.]

The PSC held that the refund did not have to be "precisely tailored to each and every Detroit Edison customer who paid a self-implemented rate." It continued:

> Other than requiring that the refund to primary customers be based on their pro rata share of the total revenues collected through the applicable increase, the

statute leaves the method of the refund up to the Commission's discretion. MCL 460.6a(1). The Commission has long rejected the notion that historical perfection must be achieved with refunds or surcharges. The Commission has authority to exercise discretion in fashioning a refund procedure, and the most precise procedure may have disadvantages, such as attendant costs or administrative burdens, that outweigh the apparent advantages. See, *Attorney General v Public Service Comm*, 235 Mich App 308; 597 NW2d 264 (1999) [*Mich Gas*]; *Attorney General v Public Service Comm*, 215 Mich App 356; 546 NW2d 266 (1996) [*Mich Consol*]; May 17, 2005 order in Case No. U-13990, pp. 21-22. And, as the Staff correctly notes, the refund must be allocated based on the pro rata share of the revenue from the self-implemented increase, not on the precise dollar amount paid in excess revenue; thus, ABATE's argument in favor of a refund that reflects what each primary customer "actually paid" is inconsistent with the language of the statute. Finally, were the Commission persuaded to order a refund based on the amount each primary customer paid during self-implementation, the administrative costs associated with making those individual determinations would be addressed in a future rate case, and, under basic principles of cost causation, would likely be borne by the primary class.

The Commission approves the refund procedure proposed by the Staff and agreed to by the company, which bases the refund on rate schedule class, and forecasts sales for the refund month. Further, the Commission approves the use of the [Power Supply Cost Recovery] reconciliation proceeding as a mechanism to complete the refund, in order to make the refunded amount as exact as possible.

ABATE claimed that two unidentified ABATE members who were primary customers subject to the self-implemented rates signed up for service from alternative electric suppliers during the period that these rates were in place rather than continuing to receive bundled service from Detroit Edison. ABATE pointed out that under the refund methodology approved by the PSC,

these two primary customers would not receive a re-
fund because they were no longer in the class of
customers that would receive the refund. ABATE ar-
gued that their exclusion was arbitrary and capricious.
The PSC held:

> The Commission does not agree with ABATE that
> primary customers who chose to switch from bundled to
> choice service during the period of self-implementation are
> treated unfairly under this refund method. There was
> nothing hidden from such customers. The possibility that
> the rate increase adopted in the final order would differ
> from the unapproved rate increase self-implemented by the
> company was always present, as was the possibility that
> the final rate design would differ, however slightly, from
> the self-implemented rate design. Such customers would
> have (or should have) been aware of that fact at the point
> in time when they decided to switch. Indeed, any customer
> who made that switch early in the self-implementation
> period likely underpaid during the self-implementation
> period, since only one [retail open access] rate schedule
> overpaid during self-implementation.

## II. STANDARD OF REVIEW

In *In re Application of Consumers Energy Co for Rate
Increase*, 291 Mich App 106, 109-110; 804 NW2d 574
(2010), the Court stated:

> The standard of review for PSC orders is narrow and
> well defined. Pursuant to MCL 462.25, all rates, fares,
> charges, classification and joint rates, regulations, prac-
> tices, and services prescribed by the PSC are presumed,
> prima facie, to be lawful and reasonable. See also *Mich
> Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636;
> 209 NW2d 210 (1973). A party aggrieved by an order of the
> PSC has the burden of proving by clear and convincing
> evidence that the order is unlawful or unreasonable. MCL
> 462.26(8). To establish that a PSC order is unlawful, the
> appellant must show that the PSC failed to follow a

statutory requirement or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint,* 460 Mich 396, 427; 596 NW2d 164 (1999). A reviewing court gives due deference to the PSC's administrative expertise, and should not substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2,* 237 Mich App 82, 88; 602 NW2d 225 (1999).

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *In re Application of Consumers Energy Co,* 279 Mich App 180, 188; 756 NW2d 253 (2008). Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. *In re Complaint of Pelland Against Ameritech Mich,* 254 Mich App 675, 682; 658 NW2d 849 (2003).

It is noted that in *Attorney General v Pub Serv Comm,* 206 Mich App 290, 296; 520 NW2d 636 (1994), the Court explained that MCL 462.26(8) "requires a reviewing court to determine only whether an order is unlawful or unreasonable, not whether it is arbitrary and capricious."

The standard of review for an agency's interpretation of a statute was recently set forth in *In re Complaint of Rovas Against SBC Mich,* 482 Mich 90, 103; 754 NW2d 259 (2008), quoting *Boyer-Campbell v Fry,* 271 Mich 282, 296-297; 260 NW 165 (1935):

"[T]he construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons. However, these are not binding on the courts, and [w]hile not controlling, the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature."

This standard requires "respectful consideration" and "cogent reasons" for overruling an agency's interpretation. Furthermore, when the law is "doubtful or obscure," the agency's interpretation is an aid for discerning the Legislature's intent. However, the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue. [Citation omitted; second alteration in original.]

### III. ANALYSIS

ABATE first argues that the phrase "shall allocate any refund . . . among primary customers based upon their pro rata share of the total revenue collected through the applicable increase," MCL 460.6a(1), means that each primary customer must be given back the amount it actually overpaid pursuant to the self-implemented rate. However, the propriety of fashioning a refund by including it in a prospective billing for a class of customers depends on the interpretation given this statute. In *In re Review of Consumers Energy Co Renewable Energy Plan*, 293 Mich App 254, 269; 820 NW2d 170 (2011), quoting *In re Temporary Order to Implement 2008 PA 295*, unpublished opinion per curiam of the Court of Appeals, issued October 14, 2010 (Docket No. 290640), pp 4-7, the Court stated:

> When interpreting statutory language, this Court's primary goal is to give effect to the intent of the Legislature. "The first step is to review the language of the statute. If the statutory language is unambiguous, the Legislature is presumed to have intended the meaning expressed in the statute." *Briggs Tax Serv, LLC v Detroit Pub Schools*, 485 Mich 69, 76; 780 NW2d 753 (2010) . . . . This Court accords to every word or phrase of a statute its plain and ordinary meaning, unless a term has a special, technical meaning, or is defined in the statute. *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999); *Stocker v Tri-*

*Mount/Bay Harbor Bldg Co, Inc*, 268 Mich App 194, 199; 706 NW2d 878 (2005). See also MCL 8.3a; *Bay Co Prosecutor v Nugent*, 276 Mich App 183, 189-190; 740 NW2d 678 (2007). Furthermore, statutory language is to be read in context, and "statutory provisions are *not* to be read in isolation; rather, context matters, and thus statutory provisions are to be read as a whole." *Robinson v City of Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010) . . . .

In *Detroit Edison Co v Pub Serv Comm*, 261 Mich App 1, 8-9; 680 NW2d 512 (2004), vacated in part on other grounds 472 Mich 897 (2005), the Court stated:

> If the language of the statute is ambiguous, judicial construction to determine its meaning is appropriate. In re MCI [460 Mich 396, 411; 596 NW2d 164 (1999)]. The Legislature is presumed to be familiar with the rules of statutory construction and is charged with knowledge of existing laws on the same subject. *Inter Coop Council v Dep't of Treasury*, 257 Mich App 219, 227; 668 NW2d 181 (2003). In addition, the Legislature is presumed to act with knowledge of administrative and appellate court statutory interpretations. *Gordon Sel-Way, Inc v Spence Bros, Inc*, 438 Mich 488, 505-506; 475 NW2d 704 (1991).

We conclude that § 6a(1) is ambiguous and that it is subject to reasonable but differing interpretations. It calls for a "refund" to "customers" and, with respect to "primary customers" requires that the refund be "based upon their pro rata share of the total revenue collected through the applicable increase." This could be viewed as requiring a "refund" in the traditional sense, i.e., a return of monies previously paid. In this regard, *The American Heritage Dictionary, Second College Edition*, defines refund when used as a verb as "**1.** To return or give back. **2.** To repay (money). . . . To make repayment." When used as a noun, it is defined as "**1.** A repayment of funds. **2.** An amount repaid." However, MCL 460.6h(13) also calls for a refund under certain circumstances. Yet, in *Mich Con-*

*sol*, 215 Mich App 356, and *Mich Gas*, 235 Mich App 308, the Court concluded that § 6h(13) allowed for an adjustment of future rates and did not require a return of actual monies paid. Thus, within the context of PSC statutes, the term "refund" enjoys a broader meaning. There is nothing in the statute that compels the conclusion that use of the term "refund" means the monies returned to a primary customer must be based on the individual primary customer's actual overpayment.

Nonetheless, § 6a(1) requires that the refund to "primary customers" be based on "their" "pro rata" share of revenues collected. "Primary customers" could be interpreted to mean the individual primary customers, given that the statute refers to "primary customers" and not the class of primary customers. Conversely, the absence of the phrase "individual primary customers" allows for the "primary customers" to be viewed and treated as a group. Further, "their pro rata share" could be interpreted to mean the amount of self-implemented increase in rates that each individual customer actually paid. However, the statute could also be read as requiring that *all* of the primary customers together be given a refund based on *all* of the primary customers' pro rata share of the total revenue collected.

We conclude that there are cogent reasons supporting the agency interpretation. Although ABATE disagrees, Alan Droz, an auditor manager with the PSC, testified that implementing individual refunds to all primary customers would result in burdensome administrative costs. As the PSC noted, these costs would not be borne by the individual customers who received a refund but would be addressed in a future rate case. ABATE suggests that there is a cogent reason for overruling the PSC because basing the refund on a

prospective refund month applicable to only bundled customers will result in no refund to primary customers who switched to choice or retail open access service during the interim period. However, Droz indicated that these primary choice customers would have factored the potential loss of a refund into their decision to switch to choice. This presumption is supported by the fact that "refunds" given by way of a prospective adjustment were approved in *Mich Consol*, 215 Mich App 356, and *Mich Gas*, 235 Mich App 308. Moreover, the Legislature is presumed to have been familiar with this treatment of the term "refund" when it enacted § 6a(1). See *Detroit Edison Co v Pub Serv Comm*, 261 Mich App at 8-9. Thus, we find no cogent reason for overruling the PSC's interpretation of the statute and conclude that the PSC's action was both lawful and reasonable.

Affirmed.

HOEKSTRA, P.J., concurred with SAWYER, J.

SAAD, J. (*dissenting*). I respectfully dissent from the majority. We generally will not second-guess rulings by administrative agencies, but instead grant deference to them premised on their special expertise. Yet, when, as here, a ruling by an administrative agency defeats the public policy purposes and plain language of two key statutes, our Court must do its duty and prevent such a repudiation of the Legislature's clear mandate. After all, in the final analysis, the administrative agency should uphold, not undermine, the law the Legislature passed.

Having said this, the express language of the Customer Choice and Electricity Reliability Act (Choice Act) makes clear its public purpose is to ensure that all Michigan customers of electric power "have a choice of

electric suppliers." MCL 460.10(2)(a). The Choice Act also says its aim is to encourage competition. MCL 460.10(2)(b). Also key to our review of the agency's conduct here, the Choice Act specifically enumerates as one of its purposes to "encourage the Michigan public service commission to foster competition . . . ." *Id.* Thus, when the PSC deals with a customer of an electric utility that has exercised its legislatively encouraged choice under the Choice Act to buy electricity from a competitor of Detroit Edison, the PSC must, in its decisions, be faithful to its statutory mission to "foster competition."

In this case, a few of the primary customers[1] of Detroit Edison sought refunds of the actual amount that they overpaid Detroit Edison for electric power before they switched to buying electricity from another electric company. Their statutory right to a refund for those overpayments is set forth clearly in 2008 PA 286 (Act 286). The overpayments occurred because, for the first time in Michigan, Act 286 allows an electric utility to self-implement a rate increase, subject to later reduction by the PSC. The risk to the electric utility is that it will have to refund to its customers the amounts overpaid during this self-implementation period. Indeed, Act 286 expressly says that the utility "shall refund" customers if the PSC does not grant the full rate increase represented in the self-implemented rate. MCL 460.6a(1).

And, under applicable administrative law, the PSC generally determines how refunds will be calculated, but, importantly, Act 286 also sets forth how the PSC should calculate these refunds under the new self-implementation statute. With regard to all commercial

---

[1] "Primary customers," numbering roughly 3,000, are large purchasers of electricity.

and residential customers, roughly three million users, Act 286 affords the PSC its usual broad authority to adopt a methodology for refunds. Significantly, as to primary customers, Act 286 carves out a different way to calculate refunds, which makes it quite clear that these primary customers should simply be reimbursed for the actual amount they were overcharged. This is called the "historical approach." In other words, these primary customers know exactly how much they overpaid each month and how much less they would have paid in light of the lesser increase granted by the PSC. It is this amount they seek as a refund—the amount they overpaid—and this is the amount and the methodology that the statute requires the PSC to use. Instead, the PSC ruled that it will use the "prospective refund methodology," which means that the primary customers who were overcharged by Detroit Edison before they switched to competitors get no refund whatsoever. The PSC ruled that it will spread the total refunds to all Detroit Edison customers in the future by reducing their rates according to a formula that takes the total overcharges (the money that Detroit Edison charged over the rate eventually approved by the PSC) and spreading it among Detroit Edison customers. Thus, notwithstanding the specific refund calculation required by Act 286 for primary customers, those primary customers who overpaid and then switched electric suppliers will receive no refund. Therefore, the PSC ruling disincentivizes the very choice and competition the Choice Act expressly promotes and denies the very refunds Act 286 promised to primary customers. The net result is that in one fell swoop the PSC defeats the express language and public policy of two key statutes.

Under the umbrella of deference to the PSC, the majority endorses this ruling, with its counterintuitive result and its repudiation of the public policy underly-

ing the Choice Act and Act 286. I strongly dissent because the largest users of electricity who make the move to a Detroit Edison competitor end up losing the most. The overcharges and overpayments are never refunded. This will serve to discourage "choice" and "competition" among the largest users of electricity in this state, the very legislative objectives at the center of the Choice Act.

Again, to justify this result, the PSC cites its discretion to adopt a methodology for refunds, despite the fact that Act 286 carves out a particular method for refunds to primary customers in connection with the new self-implementation program. The PSC further justifies its unfair methodology on the self-serving theory that primary customers should have known that the PSC has broad discretion and that it likely would not have granted primary customers a refund (despite the act's language which seems to guarantee a refund). According to the PSC, primary customers must have factored this in to their decisions to switch electric suppliers and, therefore, did not really lose anything at all by the PSC's decision not to give them refunds. Not only is this rationale a form of reasoning backward from a desired result but, again, it violates the clear language of two statutes. Under our system of laws, an administrative agency, while it has broad power, does not have plenary power and certainly does not have the power to trump the Legislature it serves by undermining two statutes, by discouraging competition, and by denying a refund to the largest utility customers in our state.