# STATE OF MICHIGAN

# COURT OF APPEALS

In re Application of Indiana Michigan Power
Company for a Certificate of Necessity

---

ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

        Appellant,

V

MICHIGAN PUBLIC SERVICE COMMISSION,

        Appellee,

and

INDIANA MICHIGAN POWER COMPANY,

        Petitioner-Appellee,

and

MICHIGAN ENVIRONMENTAL COUNCIL,

        Appellee.

FOR PUBLICATION
October 21, 2014
9:10 a.m.

No. 314829
MPSC
LC No. 00-017026

---

In re Application of Indiana Michigan Power
Company for a Certificate of Necessity

---

ATTORNEY GENERAL,

        Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,

No. 314979
MPSC
LC No. 00-017026

-1-

Appellee,

and

INDIANA MICHIGAN POWER COMPANY,

Petitioner-Appellee,

and

MICHIGAN ENVIRONMENTAL COUNCIL,

Appellee.

Before: FITZGERALD, P.J., and GLEICHER and RONAYNE KRAUSE, JJ.

Per Curiam.

The Michigan Public Service Commission ("PSC") issued an order approving a certificate of necessity ("CON") for a life cycle management ("LCM") project, comprised of 117 subprojects, at the Donald C. Cook Nuclear Power Plant owned by Indiana Michigan Power Company ("Indiana Michigan"). The PSC preapproved recovery of a CON amount of $773.6 million for projected project costs, as well as a 10% management reserve of $77,361,100, for a total of $850,972,100. In these consolidated appeals,[1] appellant Association of Businesses Advocating Tariff Equity ("ABATE") and appellant Attorney General appeal as of right. We affirm in part and reverse in part.

This appeal requires construction of MCL 460.6s. Subsection (1) of this statute provides that an electric utility can seek a CON for "a significant investment in an existing electric generation facility," and that a "significant investment" may include "a group of investments reasonably planned to be made over a multiple year period not to exceed 6 years for a singular purpose such as increasing the capacity of an existing electric generation plant." Subsection (4) requires that the PSC specify the costs approved if it approves a CON. Subsection (9) provides that the PSC must include in rates all reasonable and prudent costs for which the CON has been granted when the facility is considered "used and useful."

Appellants maintain that Indiana Michigan's LCM project does not qualify for a CON under the statute. Alternatively, they argue that the PSC erred in approving a management reserve for the LCM project. ABATE argues that eight subprojects that required an incremental

---

[1] See *In Re Application of Indiana Michigan Power Co for a Certificate of Necessity*, unpublished order of the Court of Appeals, entered March 7, 2013 (Docket Nos. 314829, 314979).

expenditure for a potential future uprate should not have been approved, and the Attorney General argues that greater specification of costs allowed and disallowed was necessary.

The PSC did not err in construing the statute so as to determine that the LCM Project is a significant investment comprised of a group of investments being made for a singular purpose. Moreover, the PSC did not err in approving the eight subprojects. However, we conclude that the management reserve was not supported by substantial evidence on the whole record. We decline to address the specification of costs issue because it was not properly preserved.

## I. FACTS

In 1975 and 1978, the D.C. Cook Nuclear Power Plant placed its two nuclear reactors in service. The Nuclear Regulatory Commission ("NRC") had issued 40-year operating licenses for each reactor in 1974 and 1977, consistent with their expected 40-year life spans. In 2005, the NRC granted Indiana Michigan 20-year license renewals for the units, allowing them to operate until 2034 and 2037. Indiana Michigan indicated that the extension to 60 years would require "that the plant's systems, structures, and components be inspected, maintained, refurbished, and replaced on a managed basis." In fact, the NRC exacted a commitment to manage the aging of passive, long-lived components as a condition of continued operations. Indiana Michigan confirmed that continued investment was required to maintain highly reliable operations.

Specifically, Indiana Michigan claimed that to take advantage of the license renewals, it had to undertake a multiyear project involving LCM investment in the equipment, systems and facilities of the plant. It explained that life cycle management is "a process for the timely detection and mitigation of aging effects in [systems, structures and components] that are important to plant safety, reliability and economics," and for this project included "non-recurring capital replacements required to operate for an extended license period."

Indiana Michigan sought a CON for its LCM Project, which was originally projected to cost $1.169 billion. The LCM Project included 117 subprojects that were to be implemented between the second half of 2011 through 2018. The subprojects involved replacing various components. The cost of each subproject was separately calculated, and included a risk reserve. Indiana Michigan also proposed a management reserve, incorporated in the $1.169 billion, to cover unknown contingencies for the project as a whole. It acknowledged that a power uprate of capacity was feasible (meaning power output could be increased), and that "a very small investment in the upsizing of certain equipment to accommodate a potential future uprate" was also included in the LCM Project, as it would be less costly to upsize now.

Paul Chodak III, the president and chief operating officer of Indiana Michigan, testified that the

> investments are reasonable and necessary at the Cook Plant to allow it to comply with its NRC licenses, operate safely and reliably, and continue to provide low-cost energy to [Indiana Michigan's] customers. If the LCM Project is not performed, the availability of the generation of the Cook Plant would deteriorate, which would adversely impact the cost of generation available to [Indiana

Michigan's] customers. The LCM Project is the most reasonable and prudent means of meeting our customers' needs through the end of this license period.

Michael Carlson, the Vice President of Site Support Services at the Cook Plant, added that without capital to support the LCM Project, the reactors would have to be shut down before their extended license lifetimes due to equipment degradation.

ABATE and the Attorney General argued that the LCM Project was akin to capital expenditures for maintenance that would simply allow for continued operations. They maintained that the project did not qualify as a "significant investment in an existing electric generation facility" because it was not a "group of investments" made "for a singular purpose such as increasing the capacity of an existing electric generation plant." Regarding this point, the PSC concluded that the requirement that a project be for a "singular purpose" did not require that the project increase capacity, and that "an LCM project, for the singular purpose of assuring that safe and reliable power can continue to be produced from a nuclear generation facility until the end of its extended license, comports with the requirements of Section 6s(1) and thus is eligible for a CON." Further, it concluded that the costs should cover the six-year period of 2013 through 2018 (rather than the second half of 2011 though 2018 as had been requested), and that the costs for this abbreviated period would total $773,611,000.

Appellants also argued that a management reserve should be disallowed. The PSC agreed that Indiana Michigan had not carried its burden of proving that a proposed management reserve of $220 million, in addition to the risk reserve included in the CON amount, was reasonable. However, acknowledging that "knowledge of the future is not achievable given the complexity of the LCM project and the tasks and resources required to achieve it," the PSC found "it appropriate to include a management reserve of 10% of the base cost of the project," which amounted to $77,361,100.

Finally ABATE argued that, to the extent eight subprojects involved upsizing some equipment to accommodate a potential future uprate, they should be disallowed. The PSC held that the cost of replacing a turbine nearing the end of its life with significant signs of wear should be allowed. With respect to the seven other projects, the PSC held that they should be permitted even though there were incremental costs associated with future uprates for which a current need could not be established.

## II. STANDARD OF REVIEW

In *In re Application of Consumers Energy Co for Rate Increase*, 291 Mich App 106, 109-110; 804 NW2d 574 (2010), this Court described the scope of our review as follows:

> The standard of review for PSC orders is narrow and well defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. See also *Michigan Consolidated Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To

-4-

establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). A reviewing court gives due deference to the PSC's administrative expertise, and should not substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999).

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *In re Application of Consumers Energy Co*, 279 Mich App 180, 188; 756 NW2d 253 (2008). Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

The operation of the competent, material and substantial evidence test was explained in *In re Application of Detroit Edison Co*, 483 Mich 993, 993; 764 NW2d 272 (2009):

Judicial review of administrative agency decisions must "not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views." *MERC v Detroit Symphony Orchestra*, 393 Mich 116, 124; 223 NW2d 283 (1974); see also *In re Payne*, 444 Mich 679, 692-693; 514 NW2d 121 (1994) ("When reviewing the decision of an administrative agency for substantial evidence, a court should accept the agency's findings of fact if they are supported by that quantum of evidence. A court will not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record.").

We reject ABATE's suggestion that the substantial evidence test does not apply on grounds that approval of the CON involved ratemaking. In *Detroit Edison Co v Pub Serv Comm*, 264 Mich App 462, 472; 691 NW2d 61 (2004), this Court held:

[D]etermining the interest rate to be awarded as part of a utility's full recovery of [retail open access] implementation costs [under MCL 460.10a] is highly akin to ratemaking in that it does not involve determining a factual matter but involves instead an effort to provide a fair return that is neither too high nor too low in a context in which no one interest rate can reasonably be characterized as the only fair rate.

MCL 460.10a provides: "The commission shall issue orders establishing the rates, terms, and conditions of service that allow all retail customers of an electric utility or provider to choose an alternative electric supplier." In contrast, MCL 460.6s(4) requires a contested case hearing on a CON application, MCL 460.6s(1) requires various findings before a CON can be approved, and a determination regarding the amount of estimated costs that should or should not be approved requires factual input and factual findings. Since a determination of factual matters is required, the substantial evidence test applies.

ABATE further argues that the PSC's decision regarding the management reserve was arbitrary and capricious. This Court recently held in *In re Detroit Edison Co Application*, 297 Mich App 377, 383; 823 NW2d 433 (2012), aff'd 495 Mich 884 (2013), quoting *Attorney General v Pub Serv Comm*, 206 Mich App 290, 296; 520 NW2d 636 (1994), that MCL 462.26(8) "requires a reviewing court to determine only whether an order is unlawful or unreasonable, not whether it is arbitrary and capricious."

Finally, the standard of review for an agency's interpretation of a statute was set forth in *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259 (2008), quoting *Boyer-Campbell v Fry*, 271 Mich 282, 296-297; 260 NW 165 (1935):

> "[T]he construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons. However, these are not binding on the courts, and [w]hile not controlling, the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature."
>
> This standard requires "respectful consideration" and "cogent reasons" for overruling an agency's interpretation. Furthermore, when the law is "doubtful or obscure," the agency's interpretation is an aid for discerning the Legislature's intent. However, the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue. [Citation omitted; first alteration added; second alteration in *Rovas*.]

## III. SIGNIFICANT INVESTMENT

In this case of first impression, we hold that the PSC did not err in construing MCL 460.6s(1) so as to conclude that the proposed Life Cycle Management Project is a "significant investment in an existing electric generation facility" and that it qualified as "a group of investments reasonably planned to be made over a multiple year period not to exceed 6 years for a singular purpose."

MCL 460.6s(1) provides:

An electric utility that proposes to construct an electric generation facility, *make a significant investment in an existing electric generation facility*, purchase an existing electric generation facility, or enter into a power purchase agreement for the purchase of electric capacity for a period of 6 years or longer may submit an application to the commission seeking a certificate of necessity for that construction, investment, or purchase if that construction, investment, or purchase costs $500,000,000.00 or more and a portion of the costs would be allocable to retail customers in this state. *A significant investment in an electric generation*

-6-

*facility includes a group of investments reasonably planned to be made over a multiple year period not to exceed 6 years for a singular purpose such as increasing the capacity of an existing electric generation plant.* The commission shall not issue a certificate of necessity under this section for any environmental upgrades to existing electric generation facilities or for a renewable energy system. [Emphasis added.]

Whether the investment at issue qualifies as a "significant investment" within the meaning of the statute depends on how the statute is construed.

> The primary goal of statutory interpretation is to give effect to the intent of the Legislature. *Farrington v Total Petroleum, Inc*, 442 Mich 201, 212; 501 NW2d 76 (1993). The first step in that determination is to review the language of the statute itself. *House Speaker v State Administrative Bd*, 441 Mich 547, 567; 495 NW2d 539 (1993). If the statute is unambiguous on its face, the Legislature will be presumed to have intended the meaning expressed, and judicial construction is neither required nor permissible. *Lorencz v Ford Motor Co*, 439 Mich 370, 376; 483 NW2d 844 (1992). Should a statute be ambiguous on its face, however, so that reasonable minds could differ with respect to its meaning, judicial construction is appropriate to determine the meaning. *Sam v Balardo*, 411 Mich 405, 418; 308 NW2d 142 (1981); *Heinz v Chicago Road Investment Co*, 216 Mich App 289, 295; 549 NW2d 47 (1996). [*In re MCI*, 460 Mich 396, 411-412; 596 NW2d 164 (1999).]

ABATE asserts that the other qualifying projects would increase power supply and that the doctrine of *ejusdem generis* requires an interpretation that a "significant investment" must be one that will also increase power supply. The investment at issue here, ABATE urges, "is not for new capacity but is intended to keep old capacity running in the future." According to ABATE, such "preventative maintenance" does not fall within the scope of MCL MCL 460.6s(1).

"Under the statutory construction doctrine known as *ejusdem generis*, where a general term follows a series of specific terms, the general term is interpreted 'to include only things of the same kind, class, character, or nature as those specifically enumerated.'" *Neal v Wilkes*, 470 Mich 661, 669; 685 NW2d 648 (2004), quoting *Huggett v Dep't of Natural Resources*, 464 Mich 711, 718-719; 629 NW2d 915 (2001). In *Huggett*, 464 Mich at 718, the Court stated:

> This canon gives effect to both the general and specific terms by "treating the particular words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words." [*Belanger v Warren Bd of Ed*, 432 Mich 575, 583; 443 NW2d 372 (1989)], quoting 2A Sands, Sutherland Statutory Construction (4th ed), § 47.17, p 166.

The series of terms at issue is "construct an electric generation facility, make a significant investment in an existing electric generation facility, purchase an existing electric generation facility, or enter into a power purchase agreement for the purchase of electric capacity." While three possibilities in the series could increase the capacity of a plant, this shared characteristic

does not transform "mak[ing] a significant investment in an existing electric generation facility" into a general term. It is specific in its own right. Moreover, it does not *follow* the terms that appellees would identify as "specific" such that it might be viewed as an extension of those terms. Accordingly, *ejusdem generis* does not guide our construction.

"Significant investment" is expressly defined in the statute to include "a group of investments reasonably planned to be made over a multiple year period not to exceed 6 years for a singular purpose such as increasing the capacity of an existing electric generation plant." Appellants argue, in essence, that "singular" should be construed to mean unique or extraordinary. *Black's Law Dictionary* (10th ed), defines "singular," when used as an adjective, as "individual; each." In *The American Heritage Dictionary, Second College Edition* (1991), "singular" is defined, when used as an adjective, as "[b]eing only one; individual" or alternatively as "[d]eviating strongly from a norm; rare." The two lead definitions in *Webster's New Twentieth Century Dictionary Unabridged* (1979), are "individual; separate or of or having to do with an individual or peculiar to one; private" and "remarkable; eminent; extraordinary." The dictionaries suggest that "singular" is generally thought to mean "individual," "one," *or* "extraordinary." Since the term is subject to two interpretations, it is ambiguous and judicial construction is required to effectuate Legislative intent. We note the juxtaposition of "*group* of investments" with "*singular* purpose." This context indicates that the Legislature's intent was to include a qualifying group of investments that had a common purpose, but not to require an extraordinary purpose.

Appellants note that the phrase "such as increasing the capacity of an existing electric generation plant" describes "singular purpose," and argue that the singular purpose therefore must be to increase capacity. However, had the Legislature intended that result, it would have said that a significant investment would include "a group of investments . . . for *the* singular purpose *of* increasing the capacity of an existing electric generation plant." The phrase "such as" connotes that "increasing the capacity of an existing electric generation plant" was meant to be an example of a singular purpose, not the only singular purpose that would qualify.[2]

Appellants indicate that the 117 subprojects at issue in essence involve replacing old equipment and qualify as legally insignificant capital expenditures. However, it appears that the project more closely amounts to a full-scale renovation of the Cook Nuclear Power Plant. The PSC found that it was "for the singular purpose of assuring that safe and reliable power can continue to be produced from a nuclear generation facility until the end of its extended license." This finding was supported by the testimony of Chodak and Carlson. Thus, the LCM project, comprised of 117 subprojects, appears to be the type of significant investment that the Legislature contemplated would qualify for a CON and concomitant pre-approval of costs. We find no reason to disagree with the PSC's interpretation of MCL 460.6s(1).

---

[2] ABATE argues that "such" must be defined in accord with the definition recognized in *People v Alexander*, 234 Mich App 665, 677; 599 NW2d 749 (1999). There, the Court was construing the phrase "such an institution" and looked to dictionary definitions of "such." The Court was not construing the phrase "such as," which is generally followed by an example.

IV. EIGHT SUBPROJECTS

As part of a 2010 feasibility study to define work associated with a power uprate, Indiana Michigan solicited an evaluation of "the existing plant systems and components in regard to Life Cycle Management considering the recent operating license extension." The power uprate was abandoned but the study was used in designing the LCM Project. In the interest of cost efficiency, some LCM components were sized for uprated capacity to accommodate future demand. Specifically, the testimony indicated that "costs associated with upsizing are included in 7 of the 117 LCM sub-projects. By including the cost of upsizing in the LCM Project, we will avoid having to replace this equipment at a large expense should our customers require the power uprate." Evidence demonstrated that an eighth project involved the Unit 2 Low Pressure and High Pressure Steam Turbines, which needed extensive repairs due to erosion and were nearing the end of their service lives. The testimony supported that the turbines in place were no longer commercially available and would be replaced with a technologically improved turbine that would incidentally add capacity. Further testimony supported the prudence of proactively replacing aging and obsolete equipment before failure or unreliability, which would serve to avert unscheduled downtime and the need for expedited repairs and replacement, and would allow the safety of the units to be maintained at their current levels. Moreover, there was testimony that the projects were "necessary to allow the Cook Plant to safely and reliably reach the end of the extended operating licenses."

The PSC determined that these subprojects should be covered as part of the CON. It found it reasonable to replace the Unit 2 turbine "as part of the LCM rather than wait for a catastrophic failure that could result in an extended and costly outage." Also, the PSC "agree[d] . . . that the modest incremental cost associated with upsizing certain components is justified in light of the possibility that the plant may be uprated in the not-too-distant future. The Commission also agrees that the other contested subprojects meet the LCM screening criteria."

MCL 640.6s(4) provides in pertinent part:

The commission shall grant the request [for a CON] if it determines all of the following:

(a) That the electric utility has demonstrated *a need for the power that would be supplied* by the existing or proposed electric generation facility . . . through its approved integrated resource plan that complies with subsection (11).

(b) The information supplied indicates that the existing or proposed electric generation facility will comply with all applicable state and federal environmental standards, laws, and rules.

(c) The *estimated cost of power* from the existing or proposed electric generation facility or the price of power specified in the proposed power purchase agreement *is reasonable*. . . .

(d) The *existing or proposed electric generation facility* or proposed power purchase agreement *represents the most reasonable and prudent means of*

*meeting the power need* relative to other resource options for meeting power demand, including energy efficiency programs and electric transmission efficiencies.

(e) To the extent practicable, the construction or investment in a new or existing facility in this state is completed using a workforce composed of residents of this state as determined by the commission. This subdivision does not apply to a facility that is located in a county that lies on the border with another state. [Emphasis added.]

Although some costs involved in the LCM indirectly relate to potential future uprates, we find no statutory barrier to their PSC approval. MCL 640.6s(4)(a) requires a determination regarding whether there is a "need for the power that would be supplied by the existing or proposed electric generation facility." The statutory language does not require a separate finding of need for each individual outlay forming the group of investments that comprises a "significant investment" in an existing facility under MCL 460.6s(1). If the need for power is established, the facility must be "the most reasonable and prudent means of meeting the power need" under MCL 640.6s(4)(b). MCL 640.6s(4)(c) requires an additional determination that the "estimated cost of power from the existing or proposed electric generation facility . . . is reasonable. . . ." If an investment or part of an investment was not needed to accomplish the singular purpose for which a significant investment was being made, it and its cost would arguably fail the "reasonable and prudent" test.

Here, the evidence established that the LCM Project and 117 subprojects would allow for continued operation of the facility for the duration of the extended licenses; the facility would continue to serve the need already being served. Thus, the need for the power supplied by the facility was established. The evidence also established that the turbine was both an uprate and an LCM project, that the seven other subprojects would be of a quality that would allow for future uprates, and that there was an incremental cost, at least for some of the seven, for this allowance. However, the evidence clearly supported that the turbine was needed. That it increased capacity was incidental; it was being replaced because of need rather than a current desire to uprate capacity. Moreover, because there was a current need for the seven subprojects, whether current need existed for each aspect of the subprojects did not have to be determined under MCL 640.6s(4). Rather, subsection (4) merely required that the costs be reasonable and prudent. Given testimony that the components being replaced needed replacement currently and would have to be replaced again at a much higher cost if there was an uprate, it cannot be said that the PSC acted unlawfully or unreasonably in determining that the current expense for replacements with features that would accommodate an uprate was both reasonable and prudent. Although there was a risk involved that the uprates might never occur, substantial evidence supported the determination that, on balance, the current expenditure was warranted.

V. MANAGEMENT RESERVE

Indiana Michigan offered testimony establishing that individual cost estimates were calculated for each subproject and the estimates included individual risk reserves. However, Indiana Michigan claimed that while there was a high level of confidence in the cost estimating, it was "unrealistic to assume that all anomalies have been both recognized and accounted for in

-10-

the estimates" and accordingly, Indiana Michigan chose "to apply a 20% [management] reserve to overall cost estimate." It distinguished "risk reserve" from "management reserve" as follows:

> Risk reserve is included in the funding of each project as it progresses to address discrete potential defined issues or "known unknowns" [such as deviations from the projected inflation rate, abnormal seasonal weather and attendant construction delays, and variances in commodities prices.] This amount of this reserve is based on the occurrence probability and consequences of the risk and where possible is based on data from similar projects that have been benchmarked. . . . If the given risk is not realized, then the funding reserved for its mitigation will not be expended.

In contrast, Indiana Michigan explained that management reserve

> is allocated for "unknown unknowns," [e.g. upgrading security in response to the 9/11 terrorist attacks, and price volatility of materials due to unforeseen world events, natural disasters, or other unexpected issues discovered during project implementation,] and its amount is based on guidance established by organizations such as the American Association of Cost Engineers, which provides clear guidance based on the level of project definition.

Indiana Michigan claimed that the amount it was requesting for management reserve was

> based on accepted industry practices and is a necessary and prudent project management tool for forecasting total project costs. Management reserve is a real project cost that is routinely forecast in construction projects and ultimately held for necessary cost growth due to unknown unknowns within the project (or sub-projects for the LCM). Unknown unknowns occur when internal or external factors impact the project that a project manager[, who assesses risk reserve,] cannot reasonably predict or estimate.
>
> Both risk reserve and management reserve have been included in the project cost estimate because their purposes are significantly different.
>
> * * *
>
> [M]anagement reserve is an accepted and recommended practice to include in a project cost estimate in addition to risk reserve contingency as stated by Project Management Institute (PMI) in their guidebook labeled A Guide to the Project Management Body of Knowledge (PMBOK), the Institute of Nuclear Power Operations (INPO) as stated in their document labeled 09-002, Excellence in Nuclear Project Management, the American Association of Cost Engineers (AACE) in their document labeled AACE International Recommended Practice No. 41R-08, and the American National Standards Institute (ANSI) in their document labeled ANSI/EIA Standard 748A – Standard for Earned Value Management.

Disagreement with the use of management reserve assumes that the Cook project team knows exactly what will happen in the future, and has already accounted for each outcome in the project cost estimate. While that level of knowledge is desirable, it is simply not achievable due to the complexity of the project and the tasks and resources required to complete it.

The PSC Staff originally opposed the management reserve, maintaining that the costs were purely speculative and that risk reserve of 15% to 25% had already been built into the subprojects. The Staff believed that

it is appropriate and necessary to allow the Commission to review these costs if and when they are incurred, and customers deserve some assurance that costs are being reasonably and prudently controlled on the LCM project. Furthermore, MCL 460.6s(9) already has an allowance for costs to be increased up to 110% of the amount that the Commission approves in this case if the Commission finds that the excess costs are reasonable and prudent.[3] If [Indiana Michigan's] approximate 20% management reserve is approved, combined with the 10% allowance permitted in MCL 460.6s(9), this could increase the amount an additional 30% above the individual subproject forecasted costs. It is important to note that this "30% contingency" is over and above the "15-25% risk reserve" contingency that is already built into the individual subprojects described above.

Indiana Michigan responded by claiming that 32 subprojects specified in a certain report had a cost and a contingency, but that to develop the cost for the LCM Project, "we removed all the contingency" "so we had a raw cost" "and then we added the indirect costs[, a straight 10%,] and those were the individual sub-project costs."[4] Further, there was testimony that "management reserve is the only source of contingency in the LCM project" and

that contingency costs are an appropriate and necessary component of a cost estimate of any major capital project. It is a standard practice, not just in the utility industry, but throughout the construction industry to include contingency costs in capital project estimates to account for real costs that will be incurred but cannot be known at the start of a project. . . . Management reserve is a different area of contingency not covered by risk reserves.

Indiana Michigan maintained that if "management reserve margins are not included in the approved cost estimate as typically done, then the total cost estimate will be understated and not reflect the foreseeable cost of the project."

---

[3] Subsection (9) provides for this allowance after completion of the project; it is not pre-approved as a cost of the project, which is what Indiana Michigan is seeking.

[4] There was no explanation of what comprised "indirect costs" and it is not clear whether there is a basis for distinguishing them from contingency costs.

The Administrative Law Judge recommended that the management reserve be denied, concluding in pertinent part that Indiana Michigan had not met its burden of proof:

> Although [Indiana Michigan] argues that the record is clear that the only contingency in the LCM project is the management reserve, . . . Staff correctly points out that the evidence regarding removal of all other contingencies . . . came late in the proceeding during cross-examination and was not supported by documentary evidence. . . .
>
> Further, the record is not clear that there are not multiple layers of contingencies as Staff suggests.

The PSC concluded that Indiana Michigan had "failed to carry its burden of proof to show that its proposed management reserve, over and above what appears to be risk reserve added to at least some projects, is reasonable. The portion of the record in this case dedicated to [Indiana Michigan's] testimony is rife with contradictions and late attempts to correct misstatements made in the course of the proceeding." The PSC therefore removed the proposed management reserve from the costs approved but, professing to understand "that knowledge of the future is not achievable given the complexity of the LCM project and the tasks and resources required to achieve it, the Commission finds it appropriate to include a management reserve of 10% of the base cost of the project."

Preliminarily, MCL 460.6s does not expressly speak to whether a management reserve can be included as an approved cost. Regarding approval of costs, the statute simply says:

> In a certificate of necessity under this section, the commission shall specify the costs approved for the construction of or significant investment in the electric generation facility, the price approved for the purchase of the existing electric generation facility, or the price approved for the purchase of power pursuant to the terms of the power purchase agreement. [MCL 460.6s(6).]

MCL 460.6s(9) then provides:

> Once the electric generation facility or power purchase agreement is considered used and useful or as otherwise provided in subsection (12), the commission shall include in an electric utility's retail rates all reasonable and prudent costs for an electric generation facility or power purchase agreement for which a certificate of necessity has been granted. *The commission shall not disallow recovery of costs an electric utility incurs in constructing, investing in, or purchasing an electric generation facility or in purchasing power pursuant to a power purchase agreement for which a certificate of necessity has been granted, if the costs do not exceed the costs approved by the commission in the certificate. Once the electric generation facility or power purchase agreement is considered used and useful or as otherwise provided in subsection (12), the commission shall include in the electric utility's retail rates costs actually incurred by the electric utility that exceed the costs approved by the commission only if the commission finds that the additional costs are reasonable and prudent.* If the actual costs incurred by the

-13-

electric utility exceed the costs approved by the commission, the electric utility has the burden of proving by a preponderance of the evidence that the costs are reasonable and prudent. The portion of the cost of a plant, facility, or power purchase agreement which exceeds 110% of the cost approved by the commission is presumed to have been incurred due to a lack of prudence. The commission may include any or all of the portion of the cost in excess of 110% of the cost approved by the commission if the commission finds by a preponderance of the evidence that the costs were prudently incurred. [Emphasis added.]

Thus, subsection (9) provides that approved costs can be recovered in rates when a facility becomes used and useful. If the costs are not preapproved but are nonetheless incurred, subsection (9) provides that they may be recovered if reasonable and prudent. Thus, the question is not whether the utility will be able to recover the costs, but whether they will be pre-approved.

Appellants argue that the provision in subsection (9) for recovery of actual costs implies that a management reserve was not contemplated as part of the costs pre-approved with issuance of a CON. However, nothing in subsection (6) or subsection (9) would preclude pre-approval of a management reserve cost. If testimony established that a management reserve was a legitimate cost associated with a qualifying project, subsection (6) would merely require that it be specified. Subsection (9) provides that all reasonable and prudent costs for a facility covered by a CON be included in rates, whether pre-approved or not. If preapproved, there is no concern that the utility would get a windfall if ultimately the costs were not incurred; although subsection (9) states that pre-approved "costs" cannot be disallowed, if they are not incurred they would not qualify as a "cost." Thus, if preapproved there is an assurance of recovery in rates if incurred. If not pre-approved, the utility does not absorb the cost but simply loses the benefit of pre-approval.

Here, ample testimony supported the inclusion of a cost for contingencies in the estimated costs of the LCM Project. However, the testimony was confused regarding whether contingencies were covered in part by risk reserve built into the individual subprojects. Indiana Michigan first presented testimony indicating that some contingencies were covered by risk reserve and then presented undocumented testimony indicating that all contingencies had been stripped out of at least some subprojects. Given the questions that remained regarding management reserve, the PSC did not err when it found that Indiana Michigan did not establish that management reserve was a reasonable cost by substantial evidence on the whole record.

Indiana Michigan had proposed a management reserve of 20% of estimated costs. There was no evidence explaining the origin of this figure or its reasonableness. Thus, even if Indiana Michigan had established that a management reserve was a reasonable cost generally, it failed to establish that the amount of the cost was reasonable. Coextensively, there was no factual basis for the PSC's determination that 10% of estimated costs represented a reasonable management reserve. Citing *Consumers Power Co v Pub Serv Comm*, 189 Mich App 151, 187; 472 NW2d 77 (1991), it is suggested that the PSC's provision for 10% as a management reserve was within a range of values presented and was therefore supported by substantial evidence. However, the

PSC expressly found that the reasonableness of a 20% management reserve was not supported by the record.[5] It then included a 10% management reserve, not because record evidence supported this cost, but "because the Commission understands that knowledge of the future is not achievable given the complexity of the LCM project and the tasks and resources required to achieve it." It remains unclear why the PSC chose 10% as opposed to 1% or 15%. Since the amount of this cost was not supported by substantial evidence on the whole record, there was no showing that the cost was reasonable within the meaning of MCL 460.6s(4)(c), and the PSC's order was not reasonable within the meaning of MCL 462.26(8) to the extent that it approved this cost. Accordingly, this cost should not have been preapproved and Indiana Michigan should be entitled to these costs only if it is able to establish after the fact that the costs were reasonable and prudent.

## VI. NEED FOR SPECIFICATION OF COSTS OF THE 117 SUBPROJECTS

The Attorney General argues that the PSC did not specify the costs it allowed and those it disallowed as required by MCL 460.6s(6), which provides:

> In a certificate of necessity under this section, the commission shall specify the costs approved for the construction of or significant investment in the electric generation facility, the price approved for the purchase of the existing electric generation facility, or the price approved for the purchase of power pursuant to the terms of the power purchase agreement.

The Attorney General asserts that a remand is necessary for specification. Further, the Attorney General insists this issue was preserved by several citations to MCL 460.6s(6) in exceptions to the proposal for decision. The Attorney General mentioned that MCL 460.6s(6) requires specification of costs in the context of its argument that the PSC had to approve or reject but could not amend or modify Indiana Michigan's application for a CON, an argument that the Attorney General has not pursued on appeal. Moreover, the Attorney General noted that MCL 460.6s(6) relates to the nature and reasonableness of costs, and discussed this provision in the context of discussing whether contingent costs can be approved as a specific cost. The Attorney General never challenged the failure to specify costs allowed and disallowed. "Failure to file exceptions to a proposal for decision in a timely manner constitutes a waiver of the objection." *Attorney General v Pub Serv Comm*, 174 Mich App 161, 164; 435 NW2d 752 (1988). This issue is not preserved.

---

[5] In arguing that projects with uprate modifications should be excluded from the LCM project, a witness for the Attorney General argued that those projects should be removed along with the proposed management reserve, and that an adjusted 20% management reserve should then be added back in. Again, there was no evidence addressing where this figure came from or why it should be regarded as reasonable. Moreover, it did not establish a range of values that would have supported the 10% range chosen by the PSC.

The record indicates that the costs for each subproject were broken down and that these were the costs approved by the PSC. However, it is not clear from the record on appeal to what extent costs were itemized. The statute speaks of "*costs* approved" but does not indicate the level of specificity required. It could mean the total cost of each composite project or require itemization of each project. If itemization is called for, what degree of itemization should be required? With a project of this complexity, itemization down to nuts and bolts would presumably be too cumbersome to be useful. Had the Attorney General argued below that the statute contemplated more specificity, the pros and cons of more specificity and the degree of appropriate specificity would have been developed and addressed by the PSC. Moreover, in considering this question it would be helpful to understand how the PSC will assess cost overruns so that it can be determined what is an overrun and what was a pre-approved cost. Since we have neither this information nor the benefit of the PSC's determination regarding this issue, we decline to consider it.

We affirm in part and reverse in part.

/s/ E. Thomas Fitzgerald
/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause