*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* APPLICATION OF CONSUMERS ENERGY FOR APPROVAL OF AN INTEGRATED RESOURCE PLAN.

WOLVERINE POWER SUPPLY COOPERATIVE, INC.,

Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION, CADILLAC RENEWABLE ENERGY, LLC, GENESEE POWER PARTNERS LIMITED PARTNERSHIP, DECKER ENERGY-GRAYLING, LLC, TONDU CORPORATION, NATIONAL ENERGY OF LINCOLN, INC., NATIONAL ENERGY OF MCBAIN, INC., MICHIGAN ENVIRONMENTAL COUNCIL, HEMLOCK SEMICONDUCTOR OPERATIONS, LLC, SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, and CITIZENS UTILITY BOARD OF MICHIGAN,

Appellees,

and

CONSUMERS ENERGY COMPANY,

Petitioner-Appellee.

UNPUBLISHED
March 23, 2023

No. 362294
Public Service Commission
LC No. 00-021090

Before: GLEICHER, C.J., and O'BRIEN and MALDONADO, JJ.

PER CURIAM.

-1-

Appellant, Wolverine Power Supply Cooperative (Wolverine), appeals as of right the order of the Michigan Public Service Commission (MPSC) approving a settlement agreement for an integrated resource plan (IRP) filed by petitioner-appellee, Consumers Energy Company (Consumers). Wolverine contests the settlement agreement insofar as it binds Consumers to retire a coal-fired electricity-generating facility known as Campbell Unit 3 in 2025 instead of 2039 as originally planned. We affirm.

## I. BACKGROUND

Effective April 20, 2017, MCL 460.6t requires the MPSC to periodically commence proceedings to assess many legal and practical concerns relating to production, delivery, and consumption of electricity in this state. MCL 460.6t(3) requires certain electric utilities to file an IRP with the MPSC, and subsection (8)(a) requires the MPSC to approve the IRP if it, among other things, "represents the most reasonable and prudent means of meeting the electric utility's energy and capacity needs" by balancing enumerated factors.

Pursuant to this statute, Consumers filed an application with the MPSC on June 30, 2021, which, in pertinent part, proposed "accelerating the retirement of Campbell Unit 3 from December 31, 2039 to May 31, 2025" as part of its IRP. Wolverine is a joint owner of Campbell Unit 3. Proceedings commenced on Consumers' application, and intervenor status was granted to Wolverine as well as appellees in this case.

Following an evidentiary hearing before an administrative law judge (ALJ), the ALJ issued a proposal for decision (PFD), recommending several modifications of the IRP and Consumers' proposed course of action (PCA), including modifications to Consumers' proposed retirement of Campbell Unit 3. The ALJ expressed concerns about Consumers' capacity-sufficiency analysis on the ground that Consumers' assumptions "are not consistent with how [Midcontinent Independent System Operator (MISO)[1]] operates, where all resources are used to serve all loads, and where the company is never in fact islanded." The ALJ concluded that the record did not establish that early retirement of Campbell Unit 3 was the most reasonable and prudent plan, stating that "[t]he PFD agrees with Staff that additional modeling of Campbell [Unit] 3 retirement is necessary because the company's decision to retire the unit in 2025 is not well supported." The ALJ expressed concern about permitting Consumers to retire Campbell Unit 3 in 2025 on the basis of assumptions about Consumers' purchasing other resources for power generation. It

---

[1] MCL 460.6w(12)(a) recognizes MISO as the "[a]ppropriate independent system operator" for purposes of the applicable statutory scheme. MISO in turn describes itself as "an independent, not-for-profit, member-based organization focused on . . . [m]anaging the flow of high-voltage electricity across 15 U.S. states and" a province of Canada, "[f]acilitating one of the world's largest energy markets," and "[p]lanning the grid of the future," and boasts that "45 million people depend on MISO to generate and transmit the right amount of electricity every minute of every day— reliably, dependably, and cost-effectively." https://www.misoenergy.org/about/ (accessed March 1, 2023). MISO has established 10 zones for its purposes, and the zone pertinent to this case— Local Resource Zone 7—covers most of Michigan's Lower Peninsula. *In re Implementing Section 6w of 2016 PA 341 for Cloverland Electric Coop*, 329 Mich App 163, 168; 942 NW2d 38 (2019).

recommended that Consumers "evaluate the retirement of Campbell 3 in isolation, with the objective of retiring the unit in 2025, but with analysis of other resource options," including the purchase of additional power-generating resources, as well as "additional renewables, storage, and strategically installed [reciprocating internal combustion engine] generation." The ALJ further recommended that Consumers "update its input assumptions for solar and battery storage, using company results where possible, supplemented with more recent [outside] data in cases where the company has limited cost or performance information."

After the PFD was issued, Consumers entered into a settlement agreement with the appellees. As recounted by the MPSC's final order on appeal:

> The settlement agreement recommends approval of Consumers' [PCA] with changes and covers issues such as: the acquisition of new resources; investments in demand response (DR), conservation voltage reduction (CVR), and energy waste reduction (EWR); deployment of energy storage; retirement of certain coal-fired generation units and associated decommissioning costs; a financial compensation mechanism (FCM); avoided cost methodology under the Public Utility Regulatory Policies Act of 1978 (PURPA); and implementation of competitive bidding.

As to the "retirement of certain coal-fired generation units" relevant to this appeal, the settlement agreement provided for the retirement of Campbell Unit 3 "on or before May 31, 2025."

Certain intervenors, including Wolverine, filed responses objecting to the settlement agreement. The competing parties (i.e., signatories to the settlement agreement and those objecting to the agreement) then filed direct testimony, rebuttal testimony, initial briefs, and reply briefs, creating an evidentiary record of the contested settlement proceeding consisting of 315 pages of transcript and 22 exhibits. As relevant to this appeal, and as noted by the MPSC in its final order, witnesses disagreed about the reasonableness of retiring Campbell Unit 3 as specified in the settlement agreement, with Wolverine in particular coming out against this facet of the agreement.

The MPSC, however, was persuaded by witnesses who testified in favor of retiring Campbell Unit 3, finding that the retirement of Campbell Unit 1, 2, and 3 "will result in savings to ratepayers, reduce the production of environmental pollutants, such as $SO_2$, $NO_x$, and particulate matter, and advance Michigan's clean energy goals as outlined in the MI Healthy Climate Plan as well as provide additional public health benefits[.]" The MPSC ultimately concluded:

> [T]he Commission finds that . . . the settlement agreement is in the public interest. The Commission also finds that the proposed settlement agreement is a fair and reasonable resolution of this proceeding. In addition, having read the record, the Commission likewise finds the settlement agreement to be supported by substantial evidence on the record as a whole. Moreover, as agreed to by the parties . . . and supported by the record, the Commission finds that Consumers' PCA as amended by the settlement agreement is the most reasonable and prudent means of meeting Consumers' energy and capacity needs and otherwise meets the requirements of MCL 460.6t(8).

This appeal followed.

## II. STANDARD OF REVIEW

An MPSC order "approving an integrated resource plan may be reviewed by the court of appeals upon a filing by a party to the commission proceeding within 30 days after the order is issued," and review must "be based solely on the record before the commission and briefs to the court and is limited to whether the order conforms to the constitution and laws of this state and the United States and is within the authority of the commission under this act." MCL 460.6t(16).

A final order of the MPSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *In re Consumers Energy Co*, 279 Mich App 180, 188; 756 NW2d 253 (2008). To establish that an MPSC order is unlawful, the appellant must show that the MPSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999).

## III. ANALYSIS

As previously explained, Wolverine contests the settlement agreement insofar as it binds Consumers to retire Campbell Unit 3 sooner than originally planned. For reasons that will be explained, Wolverine has failed to show that the MPSC's order approving the settlement agreement was unlawful or unreasonable, and is therefore not entitled to relief.

MCL 24.278(2) authorizes administrative agencies, except as otherwise provided by law, to dispose of contested cases "by stipulation, agreed settlement, consent order, waiver, default or other method agreed upon by the parties." Some of the parties opposing Wolverine's appeal highlight that Wolverine has not addressed Mich Admin Code R 792.10431, which covers settlements of proceedings before the MPSC. Wolverine, however, does not argue that the proceedings below involved faulty procedures by reference to that rule. Instead, Wolverine asserts substantive error on the basis of MCL 460.6t and general principles of reasonableness.

An IRP is a comprehensive plan developed by an electric utility forecasting its ability to meet current and future capacity needs, thus anticipating customer demands and available resources for power generation. See MCL 460.6t(5) (setting forth the requirements for an IRP). MCL 460.6t(1) calls on the MPSC to commence periodic proceedings for purposes including, under Subdivision (f), to "[e]stablish the modeling scenarios and assumptions each electric utility should include in addition to its own scenarios and assumptions in developing its integrated resource plan . . . ."

Under MCL 460.6t(8), the MPSC "shall approve the integrated resource plan" upon making certain determinations. As relevant to this appeal, this includes, under Subdivision (a), that the IRP "represents the most reasonable and prudent means of meeting the electric utility's energy and capacity needs," as determined through the balancing of the following criteria: resource adequacy and capacity, compliance with environmental regulations, competitive pricing, reliability, commodity price risks, diversity of generation supply, and the reasonableness of levels of demand response and energy-waste reduction.

That the statutory scheme envisions balancing various criteria indicates that no particular such balance must itself necessarily constitute the one best approach for satisfying it, but rather that the IRP, as a whole array of balances, must constitute the most reasonable and prudent means of achieving such balancing. Wolverine complains that the MPSC "improperly prioritized reducing carbon emissions over reasonable timing to ensure reliable energy," and argues that the goal of reducing emissions "need not be a mutually exclusively argument of environment **or** reliability, but should, in actuality, reflect a balancing of environment and reliability as responsibly planned and supported by proper modeling." However, what Wolverine characterizes as an improper prioritizing of environmental conservation over reliability, appellees characterize as a proper balancing of those two, along with other, criteria. Wolverine's mere characterization of the MPSC's balancing of the relevant criteria does not satisfy Wolverine's duty of proving that the MPSC's order approving the IRP was unlawful or unreasonable.

## A. "[M]OST REASONABLE AND PRUDENT MEANS"

Wolverine further stresses the requirement of MCL 460.6t(8)(a) that the MPSC approve an IRP upon concluding that it "represents the most reasonable and prudent means of meeting the electric utility's energy and capacity needs," arguing this this section requires the MPSC "to approve *only* the most reasonable and prudent IRP." We disagree with Wolverine, however, that MCL 460.6t(8)(a) commands the MPSC to independently determine some single, best, balancing of IRP factors and then withhold approval of all IRP proposals, whether arrived at by settlement or otherwise, that deviate from such a determination. Instead, the requirement that the MPSC approve "the most reasonable and prudent means of meeting the electric utility's energy and capacity needs" serves as a guiding principle, not as some kind of absolute goal admitting of no flexibility. Adhering to that principle means recognizing that a reasonable and prudent balancing of the applicable criteria might result in a legitimate range of acceptable results.

Regardless, for purposes of appeal, even if the MPSC was required to choose a single, best, balancing of IRP factors, such a finding would be entitled to deference by this Court, see *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999), meaning that this Court would need to generally recognize a range of acceptable outcomes. This Court's review could not involve identifying some single best possible IRP and holding the MPSC and the pertinent utility to any such finding—that would be akin to this Court substituting its judgment for the MPSC's, which is not permissible. *Id*. Instead, this Court's review is limited to ascertaining "whether the order conforms to the constitution and laws of this state and the United States and is within the authority of the commission under this act." MCL 460.6t(16). Applying that standard, the question before this Court is whether the order approving the settlement was authorized by law and is supported by competent, material, and substantial evidence on the whole record, Const 1963, art 6, § 28; *In re Consumers Energy Co*, 279 Mich App at 188, and thus whether appellant has shown by clear and convincing evidence that the order was unlawful or unreasonable, MCL 462.26(8).

## B. PROPOSAL FOR DECISION

Wolverine next places great significance on the ALJ's initial disapproval of the plan for early retirement of Campbell Unit 3 and urges excessive deference to the PFD. Wolverine notes

that, in the PFD, the ALJ expressed agreement " 'with Staff that additional modeling of Campbell [Unit] 3 retirement is necessary because the company's decision to retire the unit in 2025 is not well supported.' " Wolverine further notes that "the ALJ was concerned about permitting Consumers to retire Campbell Unit 3 in 2025 without modeling or analysis to show that the retirement would not cause Michigan to have insufficient energy for residents," and opines that "[t]he ALJ's conclusion regarding the record should have been dispositive because a position that is unsupported by record evidence cannot be revived by settlement."

Wolverine's insistence that the PFD should have been deemed "dispositive" under any circumstances is inapt. A PFD "is a proposal and is to be considered a recommendation that [the attendant agency] is free to accept, reject, or modify, even if the PFD is supported by substantial evidence." *Vanzandt v State Employees Retirement Sys*, 266 Mich App 579, 586; 701 NW2d 214 (2005) (quotation marks and citation omitted).

## C. MODELING YEARS

Wolverine further protests that the MPSC's decision to approve the early retirement of Campbell Unit 3 was flawed because it was based on insufficient modeling, from Consumers' having compared only its desired date of 2025 with the originally envisioned retirement of 2039 without exploring alternatives. Wolverine states, "While it may not be necessary to continue use of Campbell Unit 3 until 2039, claiming retirement in 2025 is the most reasonable and prudent schedule is pure speculation." The MPSC retorts that "in response to Staff's testimony the Company performed additional modeling runs for Campbell Unit 3 for the years 2028, 2030 and 2032, in addition to 2025 and 2039," citing rebuttal testimony of Richard T. Blumenstock, Consumers' Executive Director of Electric Planning. Blumenstock reported as follows:

> [T]he Company has evaluated the accelerated retirement of Campbell Unit 3 in years 2028, 2030, and 2032. The years 2026 and 2027 have no major changes in expenditures compared to 2025 and therefore were not assessed because the results would not be materially different than the results for 2025. The year 2028 was assessed since it is the year when [certain operating expenses] can be avoided if Campbell Unit 3 were to retire. The year 2030 was assessed since it is a year of major change in capacity position due to termination of the Midland Cogeneration Venture Limited Partnership Power Purchase Agreement. The year 2032 was assessed to understand the impact of accumulating investment and expense beyond 2030.

Wolverine responds that "Consumers did not consider retiring Campbell Unit 3 in these years individually like it did for the other proposed retired units," that "Consumers' considered retiring Campbell Unit 3 only in 2025 and 2039 individually," and that for the other years "Campbell Unit 3's retirement was not independently considered but was inherently tied to the assumption that Campbell Units 1 and 2 would also be retired early in 2025." However, the settlement ultimately provided for retirement of all three Campbell units "on or before May 31, 2025," thus validating Consumers' decision to consider 2028, 2030, and 2032 on that basis. Developments after the PFD was issued undercut the ALJ's then-stated, and Wolverine's continuing, concerns about additional modeling.

## D. OTHER OBJECTIONS

Wolverine acknowledges that the MPSC's Staff, after having initially expressed dissatisfaction with the plan for early retirement of Campbell Unit 3, went on to agree to the subject settlement agreement, and implies that the Staff changed its position arbitrarily. The better explanation for the Staff's changed position, however, is that the Staff's participation in subsequent negotiations left the Staff satisfied with what the settlement agreement embodied. As the MPSC noted, its Staff ultimately concluded that the settlement agreement presented "a resource adequacy improvement over the Company's original PCA" while specifying certain new such resources.

Wolverine notes that the MPSC "stated that Consumers is not responsible for reliability of all of MISO Zone 7, but noted that 'it is also clear that a deficiency in any part of Zone 7 would increase the likelihood of grid outages for all customers in Zone 7, including those served by Consumers.'" Based on these statements, Wolverine argues that it is "unbelievable . . . to conclude that an IRP increasing the likelihood of deficiency could possible [sic] reflect the most reasonable and prudent plan." The MPSC was not, however, admitting to any such deficiency, but merely acknowledging something to be kept in view. In fact, the MPSC immediately followed its expression of concern with an expression of satisfaction, stating, "[H]owever, the approval of the settlement agreement enhances zonal resource adequacy in the short, medium, and long term(s)," then citing record evidence in support of those conclusions before declaring that "the Commission is satisfied that the approval of the settlement agreement will enhance resource adequacy in Zone 7 in both the near-term and long-term." Wolverine does not challenge the evidence cited. Wolverine thus mischaracterizes the MPSC's statement of concern regarding capacity for MISO Zone 7 as an admission of a deficiency, then fails to address the substantive basis for the MPSC's conclusion that that concern was in fact assuaged.

The MPSC further acknowledged Wolverine's, and others', arguments "that the settlement agreement does not address the need for incremental capacity replacements in MISO Zone 7 following the retirement of Campbell Units 1, 2, and 3 to meet the resource adequacy requirements of the zone," and answered them as follows, citing evidence of record:

> The Commission finds the testimony of the Staff, [the Michigan Environmental Council, Natural Resources Defense Council, Inc., and Sierra Club (collectively, MNS)], and Consumers compelling. As Consumers testifies, the settlement agreement continues the annual solicitation process adopted by the company in its 2018 IRP. By preserving the solar ramp-up proposed in the original PCA, the settlement agreement adds 250 [zonal resource credits (ZRCs)] of new solar generation by the 2025/2026 [planning year (PY)], increasing to 852 ZRCs by the 2028/2029 PY. The settlement agreement provides that Consumers will deploy a new utility-scale battery storage program which will add approximately 71 ZRCs of new capacity to the zone. Finally, preserving the [energy-waste reduction] and [demand response] provisions from Consumers' original PCA, the settlement provides 94 ZRCs of demand-side resources by the 2025/2026 PY, increasing to 2031 ZRCs by the 2028/2029 PY. The settlement also provides for increases in both the demand-side resources and solar resources in later years.

In addition to these new resources, the settlement agreement provides for the acquisition of the Covert plant, which will transfer approximately 1,114 ZRCs . . . into MISO Zone 7. The settlement agreement has the effect of adding approximately 770 ZRCs through the continued operation of Karn Units 3 and 4 until May 31, 2031, consistent with the design lives of those units.

MNS provides that "the settlement [agreement] will result in a projected net increase of at least 127 ZRCs. By 2028/29, the projected net increase will be at least 923 ZRCs." The Staff further contends that, "[t]he Company was originally proposing to retire approximately 2800 MW (nameplate) generation from MISO Zone 7 . . . ," meanwhile the settlement agreement "only retires a portion of that amount, approximately 1500 MW . . . ." The projections by both MNS and the Staff are in addition to any resources that may be acquired through the one-time solicitation, discussed below. As Consumers observes, the settlement agreement provides for more capacity in Zone 7 than was included in the company's originally filed PCA. The Commission thus finds that the settlement agreement provides a reasonable and prudent plan for meeting resource adequacy requirements. [Citing testimony of Douglas Jester, Thomas Clark, and Paul Proudfoot (record citations omitted).]

" 'Substantial evidence' is evidence which a reasoning mind would accept as sufficient to support a conclusion." *Tomczik v State Tenure Comm*, 175 Mich App 495, 499; 438 NW2d 642 (1989). "While it consists of more than a scintilla of evidence, it may be substantially less than a preponderance." *Id*. The MPSC cited competent testimony for all of its conclusions, and Wolverine fails to challenge those conclusions or the bases for them, except by pointing out that the PFD had initially taken a different position. When applying the substantial-evidence test, however, "it does not matter that the contrary position is supported by more evidence, that is, which way the evidence preponderates, but only whether the position adopted by the agency is supported by evidence from which legitimate and supportable inferences were drawn." *In re Sangster*, 340 Mich App 60, 67; ___ NW2d ___ (2022) (quotation marks and citation omitted). As noted, the PFD served only an advisory purpose in the first instance, and the subject settlement agreement reflected developments that took place after the PFD was issued.

## IV. CONCLUSION

For these reasons, Wolverine has failed to show by clear and convincing evidence that the PSC order approving the settlement agreement was unlawful or unreasonable.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien
/s/ Allie Greenleaf Maldonado